**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

STEVEN M. ANDERSON,     *
    a Virginia resident residing at    *
    2115 South Arlington Ridge Road,    *
    Arlington, Virginia 22202,    *
    *

       **Plaintiff,**    *

v.    *     **Civil Action No. 1:19-cv-00289-LO-TCB**
    *

FLUOR INTERCONTINENTAL, INC.    *     **(JURY DEMAND)**
a California corporation    *
headquartered at    *
100 Fluor Daniel Drive,    *
Greenville, South Carolina 29607,    *
    *

       **and**    *
    *

FLUOR FEDERAL GLOBAL PROJECTS,    *
INC.    *
a Delaware corporation    *
headquartered at    *
6700 Las Colinas Blvd.,    *
Irving, Texas 75039,    *
    *

       **and**    *
    *

FLUOR FEDERAL SERVICES, LLC    *
    a Delaware limited liability company    *
    headquartered at    *
    100 Fluor Daniel Drive,    *
    Greenville, South Carolina 29607,    *
    *

       **Defendants.**    *

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiff Brigadier General (Ret.) Steven M. Anderson ("BG Anderson" or "Plaintiff") by and through his attorneys, for his First Amended Complaint against Defendants Fluor Intercontinental, Inc., Fluor Federal Global Projects, Inc., and Fluor Federal Services, LLC (collectively "Fluor" or "Defendants") alleges as follows:

**NATURE OF THE ACTION**

1.     This action involves claims for monetary damages for defamation, violation of Stored Communications Act, 18 U.S.C. § 2701, *et seq.*; violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; breach of contract; breach of the implied covenant of good faith and fair dealing; gross negligence; negligence; and violation of Virginia Code § 8.01-40 arising out of BG Anderson's recruitment by, employment with, and subsequent termination by Fluor as Fluor's Country Manager in Afghanistan and Fluor's grossly false reporting of the circumstances of same to the Department of Defense's Office of the Inspector General.

**PARTIES**

2.     BG Anderson is an individual citizen of Virginia residing at 2115 South Arlington Ridge Road, Arlington, VA 22202.

3.     Upon information and belief, Defendant Fluor Intercontinental, Inc. is a California corporation with its primary place of business at 100 Fluor Daniel Drive, Greenville, South Carolina 29607.  Pursuant to 28 U.S.C. § 1332(c)(1), Fluor Intercontinental, Inc., is thus deemed to be a citizen of California and South Carolina.  Upon information and belief, Fluor Intercontinental, Inc., is also a wholly-owned subsidiary of Fluor Corporation, Inc.

4.     Upon information and belief, Defendant Fluor Federal Global Projects, Inc. is a Delaware corporation with its primary place of business at 6700 Las Colinas Blvd., Irving, Texas 75039. Pursuant to 28 U.S.C. § 1332(c)(1), Fluor Federal Global Projects, Inc., is thus deemed to be  citizen of Delaware and Texas. Upon information and belief, Fluor Federal Global Projects, Inc., is also a wholly-owned subsidiary of Fluor Corporation, Inc.

5.     Upon information and belief, Defendant Fluor Federal Services, LLC is a Delaware limited liability company with its primary place of business at 100 Fluor Daniel Drive,

- 2 -

Greenville, South Carolina, 29607. Pursuant to 28 U.S.C. § 1332(c)(1), Fluor Federal Services, LLC, is thus deemed to be a citizen of Delaware and South Carolina. Upon information and belief, Fluor Federal Services, LLC, is a wholly-owned subsidiary of Fluor Corporation, Inc.

6.      Fluor has multiple places of business in Virginia, including at 1101 Wilson Boulevard, Suite 1900, Arlington, Virginia 22209.

## JURISDICTION AND VENUE

7.      This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action presents federal questions under the Stored Communications Act, 18 U.S.C. § 2701, *et seq*., and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.  This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in in controversy exceeds the sum of $75,000, exclusive of interest and costs and is between citizens of different States.

8.      This Court has personal jurisdiction over Fluor because Fluor has substantial, continuous, and systematic contacts with the Commonwealth of Virginia, including having an office in Virginia at 1101 Wilson Blvd, Suite 1900, Arlington, Virginia 22209.  Additionally, BG Anderson's hiring by and contract of employment with Defendants was initiated by, negotiated, and in part consummated by Defendants in Virginia.

9.      Venue is properly laid in this District pursuant to 28 U.S.C. § 1391(b)(1) because each of the Defendants is a resident of the Commonwealth of Virginia under 28 U.S.C. § 1391(c)(2).

## FACTS

**A.      The Recruitment and Hiring of BG Anderson by Fluor**

10.     BG Anderson is a Class of 1978 graduate of the United States Military Academy. He also received a Master of Science degree in Operations Research and Systems Analysis Engineering from the Naval Postgraduate School in 1987.  He is a graduate of the U.S. Army War College and of the Marine Command and Staff College, and his military awards include the Distinguished Service Medal with Oak Leaf Cluster and the Bronze Star.  BG Anderson retired in April 2010 after a 31-year career in the U.S. Army that included logistics command and staff assignments in Korea, Iraq, Kuwait, Afghanistan, Germany, Hawaii and four tours in the Pentagon.  His most notable military assignment was serving under General David Petraeus as the Deputy Chief of Staff, Logistics, for the Multi-National Force in Iraq for 15 months (August 2006 through November 2007), and he was the chief logistics architect of the Five Brigade Surge of 2007.  From 2004 to 2006, BG Anderson served as the senior logistics staff officer for U.S. Forces in Korea.  His final assignment prior to his retirement from the Army was Director of Logistics Operations and Readiness (G43) on the Army Staff in the Pentagon.  In November 2013, BG Anderson was elected into the U.S. Army Ordnance Hall of Fame.

11.     After BG Anderson's retirement from the Army and prior to his being contacted by Fluor Intercontinental, Inc., in March 2016 about BG Anderson's potential interest in becoming Fluor's Country Manager in Afghanistan, BG Anderson held numerous positions in several Service-Disabled Veteran-Owned Small Businesses, including: a) Chief Marketing Officer and part owner, Relyant LLC ("Relyant"); b) Chief Executive Officer and owner, Energistic Technologies; and c) Director, Ultralife Corporation.  BG Anderson was also on the Board of Directors of the National Association of Ordnance Contractors, and served as a consultant and advocate for energy change and renewable energy development in the United States on the basis of national security.  BG Anderson also worked pro bono for the Veterans

Voice Foundation, the National Resources Defense Council, the American Security Project, VoteVets, Environmental Entrepreneurs, and several other groups. BG Anderson also wrote numerous Op-Eds in many publications (including the New York Times) on environmental and energy issues, starred in a national television campaign sponsored by VetVoice, testified before Congress, and made dozens of speeches and appearances on panels, on radio, and on television.

12. On or about 15 March 2016 BG Anderson received a phone call from Fluor's Senior Vice President for Contingency Operations, Mr. Kevin Leonard, who asked about BG Anderson's availability and thoughts on becoming Fluor's Country Manager in Afghanistan within 60 days or so. Mr. Leonard explained to BG Anderson that Fluor's previous Country Manager had decided to depart the position unexpectedly. During this initial conversation, and in several more over the ensuing two weeks, to include several written e-mail exchanges, BG Anderson advised Mr. Leonard and the senior leadership of Fluor's Contingency Operations that as a condition of his employment with Fluor as its Country Manager in Afghanistan, it was BG Anderson's desire to remain active in two of his ongoing business entities. First, BG Anderson wanted to remain as a director/board member of Ultralife Corporation, a publicly traded lithium-ion battery and communications systems manufacturer. BG Anderson had served on Ultralife's board since 2011, and he wanted to be able to continue to attend quarterly board meetings in person during periods of time that he was not physically in Afghanistan and performing duties for Fluor (known as "R&Rs"), as well as participate in occasional telephonic earnings calls and strategy sessions during his off-duty/non-billable time while in Afghanistan. And second, BG Anderson told Mr. Leonard that he wanted to remain a principal owner (and retain his 9.8% ownership interest therein) in East Energy LLC, a privately held oil production and drilling equipment rental company. BG Anderson also wanted to be able to continue to attend the

Veterans Holding Group's ("VHG," the holding company of East Energy LLC) annual meetings in person in October each year during his R&Rs, and also participate in VHG's quarterly telephonic strategy sessions during his off-duty/non-billable time while in Afghanistan.

13. Mr. Leonard told BG Anderson that he did not see any issues with BG Anderson's conditions, since the businesses of these two entities (Ultralife Corporation and East Energy LLC) were in the energy storage/production and communications industries and were completely unrelated to Fluor's business interests or to the duties and responsibilities of Fluor's Country Manager in Afghanistan. Specifically, Mr. Leonard told BG Anderson that Fluor would not have a problem with BG Anderson's aligning his R&Rs to attend the business meetings of these entities, but to be sure to communicate his ongoing interests in these entities with Fluor's Compliance and Ethics team when Fluor hired BG Anderson. Mr. Leonard also told BG Anderson to ensure that BG Anderson got the appropriate Fluor conflict of interest paperwork/letter completed as soon as possible.

14. With regard to BG Anderson's employment and interest in Relyant, BG Anderson told Mr. Leonard that he had resigned his position as Chief Marketing Officer on 30 March 2016, and had divested all of his ownership interest in Relyant Global LLC, but would retain his approximately 6.5% non-voting Class B stock in and remain as an advisor to the Veterans Holding Group, which was a holding company owning several entities including (besides East Energy LLC) Relyant Global LLC. BG Anderson also told Mr. Leonard that he wanted to make absolutely certain that he could avoid any possible activity while working as Fluor's Country Manager in Afghanistan that could be misconstrued or misinterpreted as showing favoritism or having a conflict of interest regarding Relyant Global LLC, which had a presence in Afghanistan

and thus was a potential subcontractor or supplier to Fluor.  Mr. Leonard said he was comfortable with BG Anderson's proposed conditions.

15.     In addition to resigning his position with Relyant, so that he could accept the position offered by Fluor, in early April 2016 BG Anderson also: (a) resigned his position as a board member for the National Association of Ordnance Contractors; (b) advised the non-profit organizations for which he had previously done consulting work (Natural Resources Defense Council, Wounded Warrior Mentor Program, Environmental Entrepreneurs, American Security Project and VoteVets) that he would no longer be able to support their efforts or perform any work for them; and (c) advised each business entity for which he had previously been doing consulting work and/or with which he had a marketing agreement (International Green Structures LLC, LEEP Expeditionary Buildings, Polk Solar LLC, GoEnergistics LLC, and Omni Housing LLC) that he could no longer represent their products in any way and was immediately dissolving all existing marketing agreements.

**B.     BG Anderson's Early Employment With Fluor, and His Attempts to Comply With Fluor's Conflict of Interest Disclosure Requirements**

16.     In April 2016, BG Anderson accepted Fluor's offer to become its Country Manager in Afghanistan and, in early May 2016, he spent two weeks at Fluor's offices in Greenville, South Carolina, for in processing and training, including ethics and compliance training. While there, BG Anderson met with several of Fluor's key staff, including Mr. Mike D'Arcangelo, Mr. Ian Dolan, and Ms. Barb Stein. BG Anderson fully disclosed to each of them his two ongoing business interests (as stated in paragraph 11 above) that he had previously disclosed to and discussed with Mr. Leonard, as well as his desire to continue to pursue them during his R&Rs and/or his non-duty/non-billable time in Afghanistan. Each of those Fluor staff indicated his or her support and agreement with BG Anderson's desire, and recommended that

- 7 -

he get the Fluor Conflict of Interest disclosure letter prepared as soon as possible. BG Anderson was informed, however, that he could not prepare this letter himself, and that the letter would be prepared by someone in Fluor's legal department.

17.    Upon and immediately after his arrival at Bagram Airfield as Fluor's Country Manager on or about 19 May 2016, BG Anderson conducted in-briefings with all Fluor staff personnel and key leaders. BG Anderson explained to the entire Fluor staff there that he was formerly employed by Relyant Global LLC and, as such, he had to ensure that he avoided any and all potential conflicts of interest regarding Relyant, including any opportunities, contracts or other matters relating to Relyant.  BG Anderson also requested the Fluor staff's support in his avoiding any such conflicts, including, but not limited to, decisions or approvals of decisions regarding or relating to Relyant Global.  BG Anderson also instructed Mr. Mike Miller, Fluor's Subcontracts Manager, and Mr. Miller's staff (including Mr. Rob Walsh, Mr. John Murphree, and Ms. Cheryl McAdams) to ensure that he would be insulated and shielded from any and all decisions or actions involving Relyant Global LLC; this was to protect Fluor from any misperceptions or allegations of a conflict of interest.

18.    From the time of his arrival in Afghanistan on 19 May 2016, and throughout his tenure as Country Manager in Afghanistan with Fluor, BG Anderson repeatedly made this point with Fluor staff in numerous forums and settings, especially whenever Relyant Global LLC came up in a conversation or discussion (for example, as a potential concrete supplier or subcontractor to Fluor).

19.    On 24 August 2016, BG Anderson attended by teleconference Acquisition Compliance and Ethics Training with his staff.  This training was given by Fluor's Ms. Barb Stein and Mr. Justin Jones. During this training, BG Anderson once again stated his concern

regarding potential conflict of interest issues, and he reminded them of his need for a Fluor Conflict of Interest disclosure letter to be prepared regarding his previously disclosed other business interests. BG Anderson specifically requested Ms. Stein's and Mr. Jones' assistance in getting this documentation prepared, and Mr. Jones responded that he would help get it done.

20.    During the period from September 2016 to November 2016, BG Anderson asked Mr. Jones several times, both in writing and in person, about the status of his Conflict of Interest disclosure letter.  After checking on it, Mr. Jones advised BG Anderson that it was still being worked on in Fluor's Greenville office.

21.    Finally, on 8 December 2016, BG Anderson met with Mr. Don Yenovkian, Esq. of Fluor's legal department for an hour to discuss at length BG Anderson's need for the Conflict of Interest disclosure letter.  Specifically, BG Anderson disclosed to and discussed with Mr. Yenovkian each of the points that he had previously disclosed to Mr. Leonard in March 2016 (see paragraphs 11 through 13 above), and had reiterated during his in processing meetings with Mr. Mike D'Arcangelo, Mr. Ian Dolan, and Ms. Barb Stein in May 2016 (see paragraph 15 above).  Mr. Yenovkian appeared to take copious notes and he promised to BG Anderson that he would complete BG Anderson's Conflict of Interest disclosure letter prior to Mr. Yenovkian's departure from Afghanistan for Christmas leave on or about 15 December 2016. In the next few days thereafter Mr. Yenovkian told BG Anderson at least three times that he was "almost done" and would have the letter "completed as soon as possible."  Then, on 11 December 2016, Mr. Yenovkian advised BG Anderson that he would be working on the letter when he got back to the United States for the Christmas holidays, and that he intended to complete it during the Christmas holiday season.

22.     During the period from January 2017 to February 2017, BG Anderson reminded Mr. Yenovkian several times, through at least two emails and also in person (Mr. Yenovkian's office in Bagram was next to BG Anderson's) that he needed Mr. Yenovkian to complete his Conflict of Interest disclosure letter.  In each instance, Mr. Yenovkian promised to get to it as soon as he had some free time. Also during this period on at least two occasions BG Anderson brought up the issue with Mr. Justin Jones, and Mr. Jones promised to remind Mr. Yenovkian for BG Anderson as appropriate. However, when Mr. Yenovkian departed Afghanistan in February 2017, he had still not completed BG Anderson's Conflict of Interest disclosure letter. Having raised the issue repeatedly, BG Anderson concluded that Fluor did not consider the letter to be a priority.

### C.     Fluor's Investigation

23.     On 8 October 2017, Fluor's Mr. Greg Bauman sent BG Anderson a message asking about BG Anderson's relationship with Relyant Global, in light of the fact that Relyant was involved in competing for the Host Country National (HCN) Labor Contract from Fluor. BG Anderson replied with the following message to Mr. Bauman:

> *"Sorry just saw this.  Don Yenovkian is still working my COI paperwork -- can you ask him how it is coming?  Don was trying to finish way back in December but he has been swamped and this wasn't a priority obviously.  In light of the pending award to Relyant, perhaps now it needs to move to top of stack.*
>
> *Of course, I want to ensure my potential FLUOR COI's are fully mediated and mitigated.*
>
> *My principle concern was my board position at Ultralife -- a publically traded company (ULBI).  In April 16 Kevin Leonard, Ian Dolan, Mike D'Arcangelo and others familiar with my candidacy advised there was no conflict of interest with Fluor regarding my board position since Ultralife is a manufacturing company (lithium ion batteries and high-end communications equipment – mostly 20 watt amplifiers) that obviously doesn't operate in the same space as Fluor.  They agreed to allow me to retain my board position, as long as I attended meetings during my R&R's and Ultralife and not Fluor paid my travel expenses.*

*In April 16, prior to accepting my position with Fluor, I formally resigned from Relyant LLC and the National Association of Ordnance Contractors (NAOC). I have no active contact or affiliation with either.*

*I have a heavily diluted ownership stake in Relyant Global LLC. In May 2014, Bank America assumed ownership of Relyant LLC due to unpaid loans. Majority owners Dan Smith and Don Patton bought RELYANT LLC at public auction in Knoxville TN and then structured a new company, Veterans Holding Group LLC (VHG). In light of my previous contributions and services, they awarded me non-voting class B stock in VHG (approximately 6.5%). VHG is a holding company that has ownership in:*

*1. East Energy LLC: an oil equipment and drilling enterprise consisting of 40+ oil wells and a litany of oil drilling equipment in Beaver Dam, Kentucky (NOTE: I contributed significant funds in Sept 2014 to purchase company and gain 9.8% ownership stake)*
*2. Tennessee Veterans Rentals: an equipment rental company in Tennessee with approx. $700K in real estate holdings in Maryville Tennessee (two office buildings) and Guam (one office building)*
*3. Patent Spin LLC: a patent distributor in Florida*
*4. Relyant Global LLC: an munitions response and services company based in Maryville, TN*

*I have fully disclosed all this prior to being hired by Fluor to Kevin Leonard. I have a couple times spoken with Barb Stein and others to ensure I am straight and avoid any possible COI issues. I have avoided all dealings with Relyant Global to the maximum extent possible. Of course, I obviously occasionally run into their folks who know me here in BAF and their BD folks hit the Fluor booth at AUSA in October and said Hello. I have fully disclosed to all leaders here in Afghanistan that I used to work at Relyant LLC and am sensitive to avoiding any possible contact that might be misconstrued as favoritism towards them.*

*Of course, I am not involved at all in the details of subcontracting and supplier discussions (we buy concrete from them here at BAF). I was surprised to see they won HCN Labor but of course had nothing to do with it/decision/selection, etc. and will certainly treat them as I would any other subcontractor such as Ecolog, APS, ACHI, etc.*

*Hope this helps – tell me what else you need from me to ensure we are straight and appropriately mediate and manage this going forward"*

24.   The following morning (9 October 2017), after sending the above message to Mr. Bauman, BG Anderson decided that it would be a good idea to send a copy of it to Mr. Yenovkian, so he copied it and sent it verbatim via e-mail to Mr. Yenovkian. Mr. Yenovkian replied, *"Thanks, should not be an issue."*

25.     On 12 October 2017 and in response to his request, BG Anderson called Mr. Bauman, who advised BG Anderson that Mr. Tod Nickles, the president of APS, the incumbent contractor that was competing for the HCN Labor contract award, had complained that there was a conflict of interest regarding BG Anderson and the HCN Labor contract award.  Mr. Bauman stated that Mr. Nickles had found a publicly filed document in Florida that showed BG Anderson as an owner of Relyant LLC.  BG Anderson told Mr. Bauman that this document was outdated and not accurate, and that Relyant LLC was not a viable entity, having been reorganized in May 2014 as Relyant Global LLC.  BG Anderson also told Mr. Bauman that he was not an owner of Relyant LLC.

26.     On 27 October 2017 BG Anderson received a message from Mr. Yenovkian asking BG Anderson to call him, which BG Anderson promptly did.  BG Anderson and Mr. Yenovkian discussed BG Anderson's Conflict of Interest disclosure letter again.  Mr. Yenovkian admitted to BG Anderson that he had missed the point about the relationship between Veterans Holding Group and Relyant Global in the note BG Anderson had sent to Greg Bauman (and later sent to Mr. Yenovkian verbatim).  However, Mr. Yenovkian told BG Anderson that he didn't think it was a big deal, that he understood the situation now, and that he would take appropriate action.  Mr. Yenovkian stated that he "had worked around many far more thorny issues in the past" and that he would prepare a memorandum for record (MFR) immediately.  BG Anderson does not know if Mr. Yenovkian ever did so.

27.     On 9 December 2017, Fluor Subcontracts sent BG Anderson an electronic form containing a 90 day extension contract for APS and asked BG Anderson to approve it. BG Anderson immediately contacted Fluor's Ms. Cheryl McAdams and reminded her of his prior relationship with Relyant Global and the alleged conflict of interest issue that Mr. Tod Nickles of

APS was trying to leverage for his company's benefit.  BG Anderson directed Ms. McAdams to take his name off the approval form and replace it with his deputy, Mr. Norm McCollum.  This was consistent with how BG Anderson attempted to handle any potential or perceived conflicts of interest throughout his employment tenure with Fluor.  At all times, BG Anderson had completely recused himself from subcontracts decisions and/or any official interactions or decisions potentially related to Relyant Global LLC business development or contract activities.

28.     Additionally, BG Anderson had no role at any time in the competition for the HCN Labor Support contract, which due to its size and scope was being handled exclusively by Mr. Greg Bauman in Fluor's contracting office in Greenville, South Carolina.  BG Anderson thus could not possibly have had a conflict of interest with regard to the source selection decision.  It is BG Anderson's understanding that initially Relyant Global had been selected over APS for the HCN Labor Support contract award, but after APS raised the outdated and erroneous document that Mr. Nickles found in Florida and alleged a conflict of interest, Fluor cancelled the contract award to Relyant and awarded the contract to APS without consulting with or obtaining any input from BG Anderson.

29.     BG Anderson became aware of Fluor's internal investigation regarding BG Anderson's alleged conflict of interest relationship with Relyant when he was contacted by phone by a Fluor investigator on or about 21 January 2018.  BG Anderson fully cooperated with the investigator and answered all of his questions truthfully and to the best of his knowledge.

30.     On information and belief, on one or more occasions between January 2018 and March 2018, Fluor's investigators accessed, or caused others working on Fluor's behalf to access, BG Anderson's personal computer, his private email accounts, and his personal quarters

in Afghanistan without BG Anderson's knowledge or consent, in order to obtain information to further Fluor's investigation.

> **D.      Fluor's Wrongful and Bad Faith Termination of BG Anderson's Employment**

31.      In March 2018, Fluor's Mr. Mick Bednarek (a member of Fluor's leadership team) asked BG Anderson to come from Afghanistan to Fluor's Greenville, South Carolina, office for a "LOGCAP V Assignment Provisions Strategy Meeting" that was unrelated to Fluor's internal investigation.  BG Anderson prepared a PowerPoint presentation for this meeting.  Upon his arrival for the meeting on 15 March 2018, however, BG Anderson was told that the meeting was really with the Fluor investigators and human resources representatives about Fluor's internal investigation.  BG Anderson was taken to another Fluor building, where he met with the Fluor investigators and human resources representatives and was shown several documents, including printed emails from his private email accounts. After a short discussion about the investigation and the documents, BG Anderson was told that his employment with Fluor was being immediately terminated, and was asked to sign a document acknowledging his termination, which he did.  This occurred only four weeks after BG Anderson had received a second significant pay raise in less than six months, as well as an outstanding performance rating, and only weeks before BG Anderson was scheduled to receive a $50,000 retention bonus on his second anniversary as Country Manager in Afghanistan.

32.      BG Anderson was never informed of the findings of the Fluor internal investigation prior to the 15 March 2018 meeting and Fluor's termination of his employment. He was also never afforded an opportunity to address any of the findings of the investigation, either by explanation or with evidence to contradict the findings of the investigation.  In short, the Fluor internal investigation was not conducted impartially or fairly, and Fluor violated BG

Anderson's privacy rights and acted in bad faith by conducting an entirely partial investigation and terminating BG Anderson's employment in the manner that it did and in order to avoid paying BG Anderson the retention bonus to which he would imminently be entitled.  Moreover, Fluor's actions humiliated and defamed BG Anderson, in that he was lured to Fluor's Greenville office under false pretenses, was never given an opportunity to rebut any of the investigation's findings, and was not allowed to return to Afghanistan to explain what occurred to his Fluor staff or to retrieve his personal belongings.

33.     On information and belief, Fluor prepared an investigation report, but Fluor did not provide, and has never provided, to BG Anderson a copy of the report.

34.     Fluor did prepare and provide to the Inspector General of the Department of Defense ("DoD IG") a letter dated 19 March 2018 in which Fluor summarized its investigation findings.  However, Fluor also never provided to BG Anderson a copy of this letter.  BG Anderson only found out about its existence when on 11 October 2018 he received a redacted copy of it from the U.S. Army's Office of the Judge Advocate General, Procurement Fraud Division, as an attachment to a Notice of Proposed Debarment dated 27 September 2018, from the Army's Suspension and Debarment Official.

35.     Many of the statements and conclusions asserted in Fluor's letter to the DoD IG are either completely false or do not support a finding of BG Anderson having a conflict of interest or of his failing to disclose to Fluor his business relationships with other companies.

36.     Specifically, the Fluor letter to the DoD IG alleges "timekeeping irregularities" in that approximately 5% of BG Anderson's labor charged to the LOGCAP IV TO 5 contract was spent in support of the business interests of other entities such as Relyant Global and VHG instead of Fluor.  This is completely false.  While in Afghanistan BG Anderson worked

approximately 84 hours per week for Fluor on the LOGCAP IV TO 5 contract, and did all of his personal business (for example, emails, and perhaps a late night phone call once or twice per month) relating to his previously disclosed outside business interests on his personal computer and personal cell phone during his off duty time.  None of BG Anderson's personal business time was charged to the Fluor contract, and consequently none of it was ever billed to the U.S. Government. Additionally, BG Anderson only participated in meetings related to his previously disclosed personal business interests during his R&R time outside of Afghanistan, and neither that time nor his transportation costs for his R&R were charged to the Fluor contract or paid for by the U.S. Government.

37.     Additionally, BG Anderson consistently recused himself from any decisions or actions involving Relyant which could have been perceived as a conflict of interest.  BG Anderson had no role whatsoever in the HCN Labor Support contract competition, and never used his position with Fluor to "pursue Relyant concrete contracts with the German military," as falsely alleged in Fluor's letter to the DoD IG.

38.     Fluor's letter to the DoD IG also alleged that BG Anderson "failed to disclose a personal conflict of interest as required during Fluor's 2016-2018 annual compliance & ethics certification and employee conflict of interest disclosure process."  Again, as clearly summarized in paragraphs 11 through 13 and 15 above, this is false because BG Anderson disclosed his outside business interests to Fluor, both during the hiring process to Mr. Leonard and thereafter to Fluor's key staff, and with the express understanding with Mr. Leonard that Fluor legal representatives would draft his Conflict of Interest disclosure letter.  Also as noted in paragraphs 20, 21, 23 and 25 above, BG Anderson fully cooperated with and tried repeatedly to get Fluor's

Mr. Yenovkian to complete this disclosure letter, which BG Anderson was not permitted by Fluor to draft himself. The letter was never completed through no fault of BG Anderson.

39.    Fluor's letter to the DoD IG also alleged that BG Anderson "had a financial interest in and appears to have inappropriately assisted Fluor supplier and potential subcontractor, Relyant Global LLC. . . ." This allegation is also false. As previously stated in paragraph 13 above, BG Anderson had disclosed to Fluor that he owned 6.5% of non-voting shares in VHG, the Relyant holding company, but had otherwise severed his other financial and business interests in Relyant Global LLC. Additionally, after he became Fluor's Country Manager in Afghanistan he informed his staff that he had this interest and consequently would recuse himself from any actions or decisions, including contract source selection and award decisions, relating to Relyant Global LLC. BG Anderson never participated in any manner in any such decisions or actions while he was the Country Manager in Afghanistan for Fluor. Furthermore, and contrary to the allegation in Fluor's letter to the DoD IG that BG Anderson "improperly disclosed nonpublic information to Relyant about Fluor's subcontract competition for Host Country support," BG Anderson never shared any Fluor nonpublic information with any person or entity outside of Fluor.

40.    On information and belief, Fluor's motivation to terminate BG Anderson's employment with Fluor had nothing to do with any of the findings of Fluor's internal investigation. Fluor is currently competing for the LOGCAP V contract, a multi-billion dollar follow-on contract to its current LOGCAP IV contract. On information and belief, Fluor was concerned that if Mr. Nickles of APS had raised the erroneous and baseless conflict of interest issue with the Army Sustainment Command, the federal agency that was running the competition for the LOGCAP V contract, then that could have affected Fluor's competitive position with

regard to the to-be-awarded LOGCAP V contract.  Therefore, to placate Mr. Nickles and keep him from doing so, as well as to avoid paying BG Anderson the substantial retention bonus to which he would soon be entitled, Fluor decided to award the HCN Labor Support contract to APS instead of Relyant, and to fire BG Anderson.

41.    With regard to the Notice of Proposed Debarment dated September 27, 2018, from the Army's Suspension and Debarment Official ("SDO"), BG Anderson spent significant time, effort, and financial resources (including legal fees) to prepare and present to the SDO his explanation of the events surrounding his hiring by Fluor, his work performance while he was Fluor's Country Manager in Afghanistan, the Fluor internal investigation, and the subsequent wrongful and bad faith termination by Fluor of his employment.  By his letter to BG Anderson dated November 19, 2018, the Army's SDO decided to "terminate the proposed debarment in [BG Anderson's] favor."  Despite the SDO's exoneration of BG Anderson, as a result of Fluor's flawed investigation, its bad faith and wrongful termination of BG Anderson's employment and other wrongful acts, BG Anderson has suffered significant and permanent damage to his personal and professional reputation within the defense logistics industry.  For example, while BG Anderson's name no longer appears on the U.S. Government's "Active" List of Individuals Proposed for Debarment, his name has been placed on the "Inactive" List of Individuals Proposed for Debarment.  Anyone in the public can access this list and see BG Anderson's name on it, and to the best of BG Anderson's knowledge and belief there exists no process available to remove his name from this list, meaning that his name will be on this list forever.

42.    When Fluor hired BG Anderson, BG Anderson discussed with Mr. Steve Whitcomb, Fluor's Director of Contingency Operations in Greenville, South Carolina, the terms of his employment with Fluor.  Mr. Whitcomb told BG Anderson that he was being hired to be

Fluor's Country Manager in Afghanistan at least until May 2019, to allow for the LOGCAP V contract award, which is anticipated to be in April 2019, and a transition period from the LOGCAP IV contract.   In addition to the $50,000 retention bonus described above, Mr. Whitcomb also promised BG Anderson that he would receive a second $50,000 retention bonus on his three-year anniversary as Fluor's Country Manager in Afghanistan in 2019.   Mr. Whitcomb also told BG Anderson that he would receive a significant pay raise to over $600,000 per year, and could continue to serve as Fluor's Country Manager in Afghanistan past May 2019 if he so desired.

43.     While BG Anderson served as Fluor's Country Manager in Afghanistan, BG Anderson received two significant pay raises, the second occurring in February 2018, only weeks before Fluor wrongfully terminated BG Anderson's employment.   BG Anderson had also received stellar performance reviews for his performance as Fluor's Country Manager in Afghanistan, with one stating that he was "the best Fluor Afghanistan country manager in the nine year history of the LOGCAP contract."

## COUNT I
### (Defamation *Per Se* and Defamation)

44.     BG Anderson re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-42, above.

45.     In his entire employment history with the Army and thereafter, BG Anderson has built up a significant personal and professional reputation as a successful and reliable provider of logistics, leadership, and management services to the U.S. Government and its contractors, including that he complies with all laws and regulations governing his conduct, such as the laws and regulations governing conflicts of interest.

46.     Because of his previous success and reputation, BG Anderson could reasonably expect employment opportunities from the U.S. Government and its contractors.

47.     In the defense logistics industry, once an individual is associated with a conflict of interest, actual or perceived, it is difficult or impossible to obtain new employment with the U.S. Government or government contractors.

48.     Fluor's statements to the Department of Defense's Office of the Inspector General regarding BG Anderson's alleged "timekeeping irregularities"; his alleged disclosures of non-public information to and role in actions involving Relyant, the HCN Labor Support contract competition, and "Relyant concrete contracts with the German military"; his alleged failure to disclose a personal conflict of interest; and his alleged "assistance to Relyant Global LLC" were materially false and were not privileged in nature.

49.     Fluor's statements were intentional and malicious in nature insomuch as Fluor made the statements with knowledge that they were false or with reckless disregard of their truth or falsity.

50.     Fluor's statements to the DOD IG imputed to BG Anderson unfitness to perform the duties for which he was employed by Fluor and a lack of integrity in the discharge of his duties as Fluor's Country Manager for Afghanistan.

51.     Fluor's statements also permanently prejudiced BG Anderson and his professional reputation in the defense logistics industry, including through, but not limited to, his permanent inclusion in the "Inactive" List of Individuals Proposed for Debarment.

52.     But for Fluor's misconduct and defamatory statements, BG Anderson would receive substantial employment opportunities with the U.S. Government and its contractors, and would economically benefit from such opportunities.

53.     As a result of Fluor's defamatory statements, BG Anderson has suffered significant irreparable harm to his personal and professional reputation, as well as damages in an amount in excess of $75,000 to be determined at trial, and is entitled to an award of compensatory damages and punitive damages.

## COUNT II
### (Violation of Stored Communications Act, 18 U.S.C. § 2701, *et seq.*)

54.     BG Anderson re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-42, above.

55.     Upon information and belief, by accessing BG Anderson's private email accounts through his personal computer in his private quarters in Afghanistan without BG Anderson's knowledge or consent during its investigation, Fluor and its investigators intentionally accessed a facility through which an electronic communication service was provided.

56.     Upon information and belief, in so doing, Fluor and its investigators intentionally obtained BG Anderson's electronic communications while they were in electronic storage in such a system in violation of 18 U.S.C. § 2701.

57.     BG Anderson has suffered damages in an amount to be determined at trial as a result of Fluor's violations and is entitled to an award of statutory damages and/or compensatory damages, punitive damages, and reasonable attorneys' fees pursuant to 18 U.S.C. § 2707.

## COUNT III
### (Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030)

58.     BG Anderson re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-42, above.

59.     Upon information and belief, by accessing BG Anderson's private email accounts through his personal computer in his private quarters in Afghanistan without BG Anderson's

knowledge or consent during its investigation, Fluor and its investigators intentionally accessed a protected computer used in a manner that affected interstate commerce of the United States without authorization and thereby obtained information in violation of 18 U.S.C. § 1030(a)(2)(C).

60.     BG Anderson has suffered loss in an amount to be determined at trial as a result of Fluor's violations and is entitled to an award of compensatory damages under 18 U.S.C. § 1030(g).

## COUNT IV
### (Breach of Contract)

61.     BG Anderson re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-42, above.

62.     During the hiring process and as an incentive to accept Fluor's offer of employment to be Fluor's Country Manager in Afghanistan, Fluor's Mr. Whitcomb made multiple promises to BG Anderson regarding the length of his employment (through May 2019), his entitlement to retention bonus payments, and his compensation, which BG Anderson accepted.

63.     BG Anderson had a valid and enforceable employment contract with Fluor, the terms of which, *inter alia*, prevented Fluor from terminating BG Anderson's employment with the intent to avoid paying him a retention bonus to which he would otherwise be entitled and which prevented Fluor from terminating BG Anderson's employment in bad faith.

64.     BG Anderson substantially performed his obligations under the terms of the employment contract, as demonstrated by, *inter alia*, his positive performance reviews and multiple salary increases.

65.     Fluor breached its contract with BG Anderson when it terminated the employment contract in March 2018 prior to the end of the agreed May 2019 term and shortly before BG Anderson was entitled to collect a significant retention bonus.

66.     As a result of Fluor's breach, BG Anderson has suffered significant irreparable harm to his personal and professional reputation, as well as damages in an amount in excess of $75,000 to be determined at trial, and is entitled to an award of compensatory damages.

### COUNT V
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

67.     BG Anderson re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-42, above.

68.     The employment contract between BG Anderson and Fluor was a valid and enforceable contract and Fluor was required to carry out its terms in good faith.

69.     The covenant of good faith and fair dealing implied in the employment contract between BG Anderson and Fluor required Fluor to deal with BG Anderson honestly, fairly, and in good faith so as to not destroy the right of BG Anderson to receive the benefits of the contract.

70.     As a party to the employment contract, Fluor could not exercise its contractual discretion in bad faith, even when such discretion was vested solely in Fluor, and therefore could not terminate the contract in bad faith.

71.     Fluor breached the implied covenant of good faith and fair dealing when it terminated BG Anderson in order to, in part, avoid having to pay him the retention bonus to which he would shortly be entitled.

72.     Fluor also breached the implied covenant of good faith and fair dealing when it terminated BG Anderson in order to, in part, protect Fluor's competitive position with regard to the to-be-awarded LOGCAP V contract.

73.     As a result of Fluor's bad faith breach of the employment contract and breaches of the covenant of good faith and fair dealing, BG Anderson has suffered significant irreparable harm to his personal and professional reputation, as well as damages in an amount in excess of $75,000 to be determined at trial, and is entitled to an award of compensatory damages.

## COUNT VI
### (Gross Negligence)

74.     BG Anderson re-alleges and incorporates herein by reference the allegations set forth in the paragraphs 1-42, above.

75.     With regard to Fluor's conflict of interest policy that required BG Anderson's disclosed interests in other businesses to be properly documented when Fluor hired BG Anderson, Fluor affirmatively assumed the obligation and thus had a duty to promptly, fully and accurately provide the appropriate resources necessary to document BG Anderson's disclosed interests in other businesses.

76.     With regard to Fluor's conduct of an internal investigation regarding the allegation that BG Anderson had a conflict of interest between his employment responsibilities with Fluor and his relationship with Relyant Global LLC, Fluor affirmatively assumed the obligation and thus had a duty to conduct a fair and impartial investigation into the alleged conflict of interest.

77.     With regard to Fluor's reporting of the results of its internal investigation to the Department of Defense's Office of the Inspector General, Fluor had a duty to report accurately researched and truthful information regarding BG Anderson.

78.     Fluor breached the foregoing duties when it failed to promptly and properly document BG Anderson's disclosed interests in other businesses, failed to conduct a fair and impartial investigation into the allegation that BG Anderson had a conflict of interest between his

employment responsibilities with Fluor and his alleged relationship with Relyant Global LLC, and failed to report accurately researched and truthful information regarding BG Anderson to the Department of Defense's Office of the Inspector General.

79.     Fluor's failures to document BG Anderson's disclosures of his interests in other businesses and its failure to conduct a fair and impartial investigation into the allegations against BG Anderson regarding a conflict of interest between his employment responsibilities with Fluor and his relationship with Relyant Global LLC caused Fluor to incorrectly conclude that BG Anderson had violated Fluor's conflict of interest policy and to terminate BG Anderson's employment with Fluor.

80.     Fluor's failure to report accurately researched and truthful information to the Department of Defense's Office of the Inspector General caused the Department of Defense to propose BG Anderson for debarment and caused his name to be permanently added to the "Inactive" List of Individuals Proposed for Debarment.

81.     Fluor acted with a conscious and voluntary disregard of the need to act with reasonable care when it failed to promptly, fully and accurately provide the appropriate resources necessary to document BG Anderson's disclosed interests in other businesses, when Fluor failed to conduct a fair and impartial investigation into the allegation that BG Anderson had a conflict of interest between his employment responsibilities with Fluor and his alleged relationship with Relyant Global LLC, and when Fluor reported inaccurate and untruthful information about BG Anderson to the Department of Defense's Office of the Inspector General.

82.     Fluor's breaches proximately caused grave injury and harm to BG Anderson, in that, *inter alia*, Fluor decided to terminate and did terminate BG Anderson's employment with Fluor only weeks after giving BG Anderson a significant pay raise and after recognizing BG

Anderson's exemplary performance as Fluor's Country Manager in Afghanistan and caused him to be proposed for debarment and his name to be permanently added to the "Inactive" List of Individuals Proposed for Debarment..

83.     As a result of Fluor's gross negligence, BG Anderson has suffered significant irreparable harm to his personal and professional reputation, as well as damages in an amount in excess of $75,000 to be determined at trial, and is entitled to an award of compensatory damages and punitive damages.

## COUNT VII
### (Negligence)

84.     BG Anderson re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-42, above.

85.     With regard to Fluor's conflict of interest policy that required BG Anderson's disclosed interests in other businesses to be properly documented when Fluor hired BG Anderson, Fluor affirmatively assumed the obligation and thus had a duty to promptly, fully and accurately provide the appropriate resources necessary to document BG Anderson's disclosed interests in other businesses.

86.     With regard to Fluor's conduct of an internal investigation regarding the allegation that BG Anderson had a conflict of interest between his employment responsibilities with Fluor and his relationship with Relyant Global LLC, Fluor affirmatively assumed the obligation and thus had a duty to conduct a fair and impartial investigation into the alleged conflict of interest.

87.     With regard to Fluor's reporting of the results of its internal investigation to the Department of Defense's Office of the Inspector General, Fluor had a duty to report accurately researched and truthful information regarding BG Anderson.

88.     Fluor breached the foregoing duties when it failed to promptly and properly document BG Anderson's disclosed interests in other businesses, failed to conduct a fair and impartial investigation into the allegation that BG Anderson had a conflict of interest between his employment responsibilities with Fluor and his alleged relationship with Relyant Global LLC, and failed to report accurately researched and truthful information regarding BG Anderson to the Department of Defense's Office of the Inspector General.

89.     Fluor's failures to document BG Anderson's disclosures of his interests in other businesses and its failure to conduct a fair and impartial investigation into the allegations against BG Anderson regarding a conflict of interest between his employment responsibilities with Fluor and his relationship with Relyant Global LLC caused Fluor to incorrectly conclude that BG Anderson had violated Fluor's conflict of interest policy and to terminate BG Anderson's employment with Fluor.

90.     Fluor's failure to report accurately researched and truthful information to the Department of Defense's Office of the Inspector General caused the Department of Defense to propose BG Anderson for debarment and caused his name to be permanently added to the "Inactive" List of Individuals Proposed for Debarment.

91.     Fluor's breaches proximately caused grave injury and harm to BG Anderson, in that, *inter alia*, Fluor decided to terminate and did terminate BG Anderson's employment with Fluor only weeks after giving BG Anderson a significant pay raise and after recognizing BG Anderson's exemplary performance as Fluor's Country Manager in Afghanistan and caused him to be proposed for debarment and his name to be permanently added to the "Inactive" List of Individuals Proposed for Debarment..

92.     As a result of Fluor's negligence, BG Anderson has suffered significant irreparable harm to his personal and professional reputation, as well as damages in an amount in excess of $75,000 to be determined at trial, and is entitled to an award of compensatory damages.

### COUNT VIII
### (Violation of Virginia Code § 8.01-40)

93.     BG Anderson re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-42, above.

94.     By voluntarily disclosing BG Anderson's name and false allegations regarding BG Anderson to the Department of Defense's Office of Inspector General without BG Anderson's written consent in order competitively position Fluor for an award of the LOGCAP V contract in the eyes of the Army Sustainment Command, Fluor used BG Anderson's name in a false light and for purposes of trade in violation of Virginia Code § 8.01-40.

95.     As a result of Fluor's violation, BG Anderson has suffered significant irreparable harm to his personal and professional reputation, as well as damages in an amount in excess of $75,000 to be determined at trial, and is entitled to an award of compensatory damages and punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brigadier General (ret.) Steven M. Anderson respectfully requests that the Court enter judgment in his favor and against Fluor and award BG Anderson:

(A)     compensatory damages in an amount in excess of $75,000 to be determined at trial;

(B)     punitive damages;

(C)     his reasonable attorneys' fees pursuant to 18 U.S.C. § 2707;

(D)     costs; and

- 28 -

(E)      any other and further relief that the Court may deem necessary and proper.


**Plaintiff hereby demands a trial by jury on all claims so triable.**

Respectfully submitted,

THOMPSON HINE LLP

Dated: July 24, 2019            By:      _____/s/ Thomas O Mason_____
                                         Eric N. Heyer  (VSB #73037)
                                         Thomas O. Mason (VSB #44723)
                                         Raymond C. McCann (VSB #19267)
                                         Sarah M. Hall (*pro hac vice* pending)
                                         1919 M Street, N.W., Suite 700
                                         Washington, D.C. 20036-1600
                                         Phone:  (202) 331-8800
                                         Fax:  (202) 331-8330
                                         Eric.Heyer@ThompsonHine.com
                                         Tom.Mason@ThompsonHine.com
                                         Ray.McCann@ThompsonHine.com

                                         *Counsel for BG Steven M. Anderson*