IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| STEVEN M. ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:19-cv-0289 |
| | ) | Hon. Liam O'Grady |
| FLUOR INTERCONTINENTAL, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## I.    MEMORANDUM OPINION AND ORDER

Before the Court are the Parties' cross-motions for summary judgment (Dkts. 224, 226).

For the reasons stated below, Anderson's motion (Dkt. 224) is **GRANTED IN PART** and

**DENIED IN PART**, and Fluor's motion (Dkt. 226) is **GRANTED.**

## II.    BACKGROUND

This case involves a complex dispute between a Retired United States Army Brigadier

General, Steve Anderson ("Anderson"), and his former employers, Fluor Corporation, Inc., Fluor

Intercontinental, Inc., Fluor Federal Services, Inc., and Fluor Federal Global Projects, Inc.

(collectively "Fluor").

### A.  Anderson's Business Ventures

After retiring from the United States Army in 2010, Anderson began participating in

numerous business ventures:

- He served as the Chief Marketing Officer ("CMO") of Relyant Global LLC
  ("Relyant") from 2014 through 2016.[1]  Dkt. 225-4, at 4.  He owned a 6.5% stake in

---

[1] Anderson was also the CMO of Relyant Global LLC's predecessor entity, Relyant LLC, starting in 2010.  Relyant LLC went insolvent in 2014 and was purchased by Bank of America.  Dkt. 231-20, at 7; Dkt. 225, at 2.  Current Relyant Global LLC majority owners Dan Smith and Don Patton bought the company at a public auction, and awarded Anderson an ownership interest "in light of Anderson's previous contributions and services" to Relyant LLC.  Dkt. 231-20, at 7.

1

Relyant's holding company, Veterans Holding Group ("VHG"). Dkt. 225-7, at 2. VHG, at relevant times, also owned (1) East Energy LLC, an oil equipment and drilling enterprise consisting of oil wells in Kentucky, (2) Tennessee Veterans Rentals, an equipment rental company in Tennessee with approximately $700,000 in commercial real estate holdings, and (3) Patent Spin LLC, a patent distributor in Florida. *See* Dkt. 225-45, at 6–7.

- Anderson owned Energistics Technologies, LLC ("Energistics"), a "consulting company." Dkt. 225-4, at 7. He also served as Energistics' Chief Executive Officer ("CEO"). Dkt. 225-2, at 2, ¶ 9. As CEO, he performed "consulting work for and/or had a marketing agreement" with several companies, including "International Green Structures LLC, LEEP Expeditionary Buildings, Polk Solar LLC, GoEnergistics LLC, and Omni Housing LLC." Dkt 225-1, at 2.

- Finally, Anderson served on the Board of Directors of Ultralife Corporation starting in 2010. Dkt. 225-2, at 3, at ¶ 14. Ultralife is a "publically [sic] traded $150M/year battery and communications equipment manufacturer (Rochester, NY)[.]" Dkt. 225-4, at 3. Anderson, at some point, owned 18,500 shares in Ultralife Corporation. Dkt. 225-7, at 33.

Anderson's involvement with these businesses initiated before he was hired by Fluor.

## B. Anderson joins Fluor as its Afghanistan Country Manager

In March 2016, Anderson emailed a former Army colleague, Kevin Leonard, about "emerging opportunities for employment with Fluor," a government contractor. Dkt. 225, at 4. Leonard, who was Fluor's Vice President of Contingency Operations at the time, Dkt. 229, at 11, ¶ 1, suggested that Anderson "might be a candidate for Fluor's Country Manager position in Afghanistan," and introduced Anderson to Fluor hiring personnel. *See* Dkt. 225, at 6, ¶¶ 13–16.

While Anderson was negotiating a position with Fluor, but before he formally joined the company in May 2016, the topic of his conflicts of interest arose. In a group email chain between Leonard, Anderson, and five Fluor staffers on March 26, 2016, Leonard suggested that Anderson's "part of Relyant" needed to be discussed. Dkt. 225-5, at 2. Leonard made this suggestion because Relyant, at the time, was positioned for Fluor opportunities. *See, e.g.*, Dkt. 229-27, at 2. This created the risk that Relyant might improperly benefit from Anderson's inside influence at Fluor.

2

Anderson responded to Leonard's email privately,[2] telling him that he intended to quit Relyant, but that he wished to retain his stake in "the company" and "remain[] on the board of directors in an advisory role[.]" Dkt. 225-11, at 1. Leonard, in a private reply to Anderson, told Anderson that Fluor's legal and human resources ("HR") staff would need to advise him on the propriety of this option. *Id.* During the hiring process, Anderson never followed up with Fluor's legal or HR staff regarding his wish to maintain a stake in VHG, Relyant's holding company. *See, e.g.*, Dkt. 229-24, at 3; Dkt. 229-25, at 3. Nor did any Fluor hiring staff, carbon copied on Leonard's initial March 26, 2016 email, inquire about Anderson's "part of Relyant" that "need[ed] to be discussed." *See* Dkt. 225-5, at 2.

Thereafter, Anderson entered a new business arrangement with Relyant. On April 12, 2016, he "executed a consulting agreement with Relyant, effective May 1, 2016, under which he [agreed to] serve as a Relyant board member and consultant in exchange for quarterly payments of $10,000." Dkt. 229, at 15, ¶ 11; Dkt. 229-22, at 2. In contemporaneous communications with Relyant, Anderson described this arrangement as a "great opportunity" to drive Relyant's business development "from this inside" and to position Relyant for acquisition within two years. *See* Dkt. 229-27, at 2–6; *see also* Dkt. 229-28, at 3. He spoke of his impending Fluor position as a two year "sabbatical" from Relyant. Dkt. 229-27, at 2.

Around the same time, Anderson, in his capacity as CEO of Energistics, Inc, entered a marketing agreement with a company called LEEP Incorporated, which makes structural insulated building panels out of polyurethane. *See* Dkt. 225, at 7, ¶ 19; Dkt. 229-29; Dkt. 229-30, at 4–5. Under this marketing agreement, Anderson agreed to tout LEEP products and refer customers to LEEP in exchange for a fee. *See* Dkt. 229-30, at 11–12. A week after Anderson

---

[2] Anderson removed the five other Fluor staffers from the carbon copy line in this response. *See* Dkt. 225-11, at 1.

signed the LEEP marketing agreement, he emailed LEEP's CEO, John Nordstrom, with the "good news" that he was hired as Fluor's Afghanistan Country Manager. *See* Dkt. 229-31, at 2. Anderson vowed to leverage his position as Fluor's Country Manager to "put [the LEEP] marketing agreement to use big time." *Id.*

Anderson did not report these business arrangements to Fluor as potential conflicts of interest when he completed Fluor's Code of Business Conduct and Ethics Certification prior to his formal onboarding.[3] *See* Dkt. 229-13.

On May 2, 2016, Anderson signed an agreement to join Fluor as its Country Manager in Afghanistan. Dkt. 229-5, at 6. In this role, Anderson was to oversee Fluor's Logistics Civil Augmentation Program IV contract ("LOGCAP IV") from Bagram Airfield. *See* Dkt. 229-3, at 3, ¶ 6; *see also* Dkt. 119-1, at 23, ¶ 12.

## C. Early Issues with Anderson's conflicts of interest in Afghanistan

Anderson arrived in Afghanistan in May 2016 soon after Fluor formally hired him. Dkt. 229, at 17, ¶ 16. The parties do not dispute that Anderson performed well in his role as Fluor's Country Manager. *See, e.g.*, Dkt. 229-10, at 7 ("[Anderson] was a good leader, he was engaged with our client. He took care of his personnel, our folks that were working on the project in a very complex wartime situation. He was insightful in terms of keeping us informed back in Greenville, and – and had, as far as I could tell, a very good rapport with our customer, both at the field grade officer level as well as some of the senior leaders, general officers.").

However, Anderson's interactions with subcontractors in Afghanistan, including Relyant,

---

[3] Anderson also did not report these potential conflicts of interest when he recertified his compliance with Fluor's Code of Business Conduct and Ethics immediately after he was hired. *See* Dkt. 229-18. Nor did he report them when he subsequently recertified Fluor's Code of Business Conduct and Ethics in 2017 and 2018. *See* Dkt. 229-19; Dkt. 229-20. This is true even though Anderson acknowledged that "compliance with the entire Code [was] one of the terms and conditions of [his] continued employment and that failure to comply with [Fluor's] Code may result in disciplinary action up to and including termination." *See, e.g.*, Dkt. 229-13, at 2.

4

immediately raised red flags within Fluor's ranks. Anderson held "[c]losed door meetings with Relyant employees" and other Fluor subcontractors two to three times a week within the "first few months of his arrival" in Afghanistan. Dkt. 229-7, at 6. Fluor operational personnel brought these meetings to the attention of Fluor's compliance team. *See* Dkt. 229-7, at 6–7 (Justin Jones, Fluor Compliance Officer) ("Q: And you mentioned other Fluor staff members who brought concerns to you. Who – who in particular, if you recall? A: Paul Genry, Chris Batt, Ron Reilly, Jason Smith, Preston Howard, and Rob Walsh. Q: And what was – what was the nature of the concerns[?] A: Just the – the meetings, the inappropriate – inappropriateness or the perception thereof, as well as feedback [Fluor staff] was receiving from the U.S. Army client contracting command, with regard to some of these companies being escorted by Mr. Anderson to meetings for sales pitch [sic]."); *see also id.* at 26 (Q: Fair to say virtually everybody on [Anderson's] floor [in Afghanistan] came to you at one time or another and raised concerns about the fact that General Anderson was having private meetings in his office with a closed door with subcontractors? A: Yes.").

Concerned that Anderson's conduct was inconsistent with Fluor's Code of Business Conduct and Ethics Certification, Fluor's compliance team held an "Acquisitions Compliance and Ethics Training" for Anderson in Afghanistan on August 24, 2016. Dkt. 229-37; Dkt. 229-36, at 2; *see also* Dkt. 229-7 ("Q: I believe you testified there were other individuals [at the training]? A: Correct. Q: So but [sic] based on your conversations with [Fluor's CONOPS Director of Compliance & Risk], who was this training for? A: Mr. Anderson.").

When the training concluded, Anderson told Fluor's compliance team that he was on the board of Ultralife and needed a conflict mitigation plan. *See* Dkt. 225-18, at 7–8. In the subsequent months, Anderson periodically spoke with Fluor's compliance personnel, reminding

5

them of his request. Dkt. 225-18, at 9–10. The compliance team forwarded Anderson's requests to Dan Yenovkian of Fluor's law department, Dkt. 225-18, at 10, who eventually met with Anderson in December 2016 to discuss Anderson's potential conflicts of interest. Dkt. 229-26, at 33. During this meeting, Anderson outlined his roles and responsibilities as a board member for Ultralife. *Id.* at 15–19. He also discussed his ownership stake in East Energy, LLC, *id.* at 20, and his consulting work with Energistics, *id.* at 22. But he did not mention VHG, nor did not explain that VHG was Relyant's holding company. *Id.* at 26–27. Anderson also told Yenovkian that he "sold all interest in Relyant [before he] was hired with Fluor." *Id.* at 25. From the information Anderson provided during the meeting, Yenovkian identified only Ultralife as a conflict of interest concern. *Id.* at 28–29.

Yenovkian states that he advised Anderson during the meeting to "firewall" any involvement in any matter related to Ultralife. Dkt. 229-26, at 27. However, Yenovkian did not write up a conflict-of-interest mitigation plan for Anderson following their meeting, Dkt. 225-39, at 12, even though Anderson repeatedly asked for one. *See* Dkt. 225, at 13, ¶¶ 62–63.

**D. Anderson's advocacy for and support of non-Fluor business interests while employed by Fluor**

Though Anderson's regular meetings with Relyant at Bagram Airfield served as the primary impetus for Fluor's initial probing of Anderson's conflicts of interest, Anderson undertook other actions that potentially stood to benefit him directly or indirectly.

Some of these actions were subtle:

- In June 2016, Anderson emailed Fluor operational staff to provide information on LEEP products and touted them as "the best performing structures" at their price point. Dkt. 229-33, at 2. Though Anderson attests that he "shut down" his marketing agreement with LEEP when he deployed to Afghanistan with Fluor in May 2016, the evidence conflicts. *Compare* Dkt. 229-6, at 18 (Anderson deposition) ("I'm saying that I shut down the [LEEP marketing agreement] before I deployed."), *with* Dkt. 229-35, at 2–4 (Anderson sharing marketing information about LEEP products to Army personnel while deployed), *and* Dkt. 229-6, at 19 (Anderson admitting that he

6

"introduced [LEEP] technology to the Bagram Energy Council" in Afghanistan). Anderson never received any compensation from LEEP.

- In October 2016, Anderson assisted with Fluor's submission of a Cost Avoidance Measure to the Department of Defense to retrofit diesel fuel-powered light sets at Bagram Airfield with solar-powered light sets that incorporated Ultralife batteries. *See* Dkt. 229-21, at 10; Dkt. 229-38, at 3, ¶¶ 4–5.

- In May 2017, Anderson touted Relyant concrete to the German military. *See* Dkt. 230-23, at 3. At some point, he also sent an email to Fluor's subcontracting staff recommending increased purchases of Relyant concrete. Dkt. 230-8, at 10.

Anderson's other actions were more brazen, though. In September 2016, Anderson called Relyant leadership and provided them with a competitor's concrete pricing, which was available to Anderson by virtue of his status as a Fluor employee. *See* Dkt. 230-19, at 2 ("[Anderson] mentioned that JSI was charging [Fluor] only $140/CM for concrete and we were charging $200/CM (we need to rethink this price)"). There is circumstantial evidence that Relyant's "rethinking," in fact, led Relyant to lower its concrete prices, which allowed it to capture more business. *See* Dkt. 225-34, at 8 ("Q: Did you change your concrete pricing as a result of learning [JSI's pricing] information from Mr. Anderson? A: I don't recall, but we did at some point change our pricing, yes. Q: Okay. And when you say you changed your pricing, did you raise it or lower it? A: Oh, we lowered it. Q: And why did you lower that price? A: Well, we were losing concrete work to JSI on both, not just Fluor, but also on the [other contract] we were competing with [JSI] on."); Dkt. 230-4, at 7 ("Q: And you testified earlier that it would have been helpful had Relyant known what JSI was charging Fluor for concrete. Do you remember that testimony? A: I do."); *but see* Dkt. 225, at 10, ¶ 44 ("BG Anderson's actions while serving as Fluor's Country Manager in Afghanistan did not have anything to do with Relyant receiving new orders for concrete or bringing in additional projects on the concrete business.").

Further, in late 2016 and early 2017,[4] Anderson undertook a campaign to provide crucial

---

[4] The first HCN recompete was announced in October 2016 and proposals were due on November 1, 2016. *See* Dkt.

information to Relyant to aid its efforts to secure Fluor's Host Country National ("HCN") task order, an opportunity valued at approximately $50 million. Dkt. 231-18, at 11, ¶ 23.

When the initial HCN solicitation deadline was approaching in October 2016, Anderson repeatedly contacted Fluor staff for information about the nature and cost of the services that the existing HCN contractors, Alliance Project Services, Inc. ("APS") and Ecolog, were providing. *See* Dkt. 230-7, at 2–3 (Anderson asking a subordinate employee, contracts manager Robert Walsh, for "a ballpark estimate" of certain "monthly pay range[s]" paid by subcontractors on the HCN task order). When Anderson obtained this "highly confidential and proprietary" information from Fluor staff who were unaware of Anderson's relationship with Relyant, Dkt. 229-9, at 5, ¶ 7; Dkt. 229-8, at 11, Anderson forwarded it to his personal email account, Dkt. 230-9, at 2–4. Some, if not all, of this information was ultimately transmitted to Relyant leadership, either by email or by phone. *See, e.g.*, Dkt. 225-34 (Deposition of Don Patton, Relyant's President and Chief Operating Officer) ("Q: And what information did [Anderson] provide to you that you considered to be proprietary information? A: Fully burdened labor rates . . . Q: And how did he provide those fully burdened labor rates to you? A: In an email. Q: In an email? A: Yes."); *id.* at 21 ("Q: Could [Anderson's disclosure have been] by a phone call or something else? A: I mean, I'm sure it could have been."); Dkt. 230-4, at 8 (Deposition of Bruce Carroll, Relyant's Vice President of Operations) ("The first time I saw the information, it was already in our costing spreadsheet. It's my understanding that information was provided to Don [Patton]."); *see also id.* at 8–9 ("Q: Did [Don Patton] tell you he got the [burdened labor] rates from Mr. Anderson? A: When I first saw it, he did not, but I've learned that since. Q: And you've learned that because Don told you that? A: Yes."); *id.* at 9 ("[W]hen we were working on

---

229, at 22–23. However, because of a suicide bombing at Bagram Airfield in November 2016, the solicitation was delayed until Spring 2017, with bidders resubmitting their final proposals on April 17, 2017. Dkt. 229, at 22, ¶ 30.

the costing, I knew that that information was provided by [Anderson].”); *id.* (“Q: Just so we have a clear record, tell me how you learned that the incumbent’s pricing came from Mr. Anderson? A: Through Don [Patton].”); *but see* Dkt. 225-34, at 21–22 (acknowledging that Relyant did not produce Anderson’s email containing this information in response to Fluor’s subpoena).

Relyant used the costing information that Anderson allegedly provided to prepare an HCN bid that was cheaper than the bids of APS and Ecolog. *See* Dkt. 229-9, at 5, ¶ 9 (“Relyant proposed burdened labor rates . . . were the same as or lower than APS’s incumbent burdened rates.”); *see also* Dkt. 229-9, at 6, ¶ 11; Dkt. 229-21, at 20–21.

After Relyant submitted its HCN bid, its leadership forwarded it to Anderson at his request. Dkt. 230-13, at 2; Dkt. 225-34, at 12 (“Q: Now, why were you sending Steve Anderson your proposal if you had already submitted it through channels to Fluor? A: He asked for a copy of it. Q: Okay. Did he tell you why he wanted a copy of it? A: I don’t recall.”).

On May 5, 2017, when the solicitation resumed after being put on hold due to a suicide bombing at Bagram Airfield, Dkt. 229, at 22, ¶ 30, Anderson provided key competitive intelligence to Relyant about the status of the award that was not publicly available:

> Regarding the labor award, looked into it today and was advised award will occur [no later than] 1 July; seven bidders, including APS and Ecolog. Subcontracts in Greenville still hasn’t had their selection board, but my subcontracts manager mentioned “Relyant is clearly in the thick of it with a very competitive bid” when I asked who the top submissions were from. That’s all I could get him to disclose. If winner is someone other than incumbent APS, they will issue a 3 month extension to 1 Oct 17 to [the incumbent] to continue thru [sic] transition period, then handoff on 1 Oct.

Dkt. 231-27, at 2; *see also* Dkt. 231-11, at 2. Anderson also discussed the HCN solicitation and other Fluor opportunities at a Relyant board meeting around the same time. *See* Dkt. 231-29, 3–4.

Relyant ended up winning the HCN solicitation, which Fluor awarded on July 27, 2017.

Dkt. 225, at 13, ¶ 67. After the decision was announced, Anderson aided in Relyant's efforts to hire APS's staff away from APS. *See* Dkt. 231-4, at 2. All the while, Anderson continued to derive income from "consulting fees" paid by Relyant and/or VHG. *See* Dkt. 230-22.

Anderson's contemporaneous communications with Relyant staff indicate his awareness that his actions were improper. *See, e.g.*, Dkt. 231-2, at 3 ("[N]ow our meetings won't be subject to scrutiny/suspicion[.]"); Dkt. 231-3, at 2 ("Now that you are an 'official' subcontractor, we need to spend more time together and can be open about it."). They also indicate his awareness that he was deriving personal benefits by assisting Relyant in its pursuit of Fluor business. *See* Dkt. 231-2 ("Why I deserve a raise ($15K/Qtr): . . . Recognition of work I did to set conditions for success (HCN Labor Contract Win) . . . Assist in eventual sale of company."); *see also* Dkt. 229-21, at 8.

### E. The aftermath of Fluor's HCN award to Relyant

Shortly after HCN was awarded to Relyant, Fluor's Director of Procurement and Subcontracts sent Anderson a message inquiring about Anderson's relationship with Relyant. Dkt. 225, at 13–14, ¶ 68. Anderson responded on or about August 8, 2017 by indicating, *inter alia*, that he owned "some non-voting class B stock in VHG, a holding company that owns . . . a restructured Relyant Global." Dkt. 225-24, at 1. Anderson then forwarded his full response to Yenovkian. *Id.* Yenovkian responded that same day: "Steve: good response. I see no issues with Relyant and will reach out to [the Director of Procurement and Subcontracts] and ensure he has no outstanding questions and move along [sic] with finalizing a . . . customized [conflict of interest] plan." Dkt. 225-42, at 1. Yenovkian then sent a message to Fluor procurement officers that stated unequivocally: "There is no conflict of interest with Relyant and Steve Anderson. We are working on a customized plan for his other interests." Dkt. 225-43, at 1. Fluor took no further actions at the time.

10

On October 19, 2017, Fluor received a letter from APS CEO Tod Nickles with the subject line: "Re: Potential Conflict of Interest / Code of Business Conduct & Ethics— Award/Bid Protest." Dkt. 231-17, at 3. In this letter, Nickles alleged that Anderson's relationship with Relyant wrongfully disadvantaged APS in the HCN solicitation. *Id.* at 3–4. Nickles provided a detailed chronology and supporting evidence in his letter. *See generally id.*

After receiving Nickles's letter, Fluor initiated an internal investigation of Anderson's potential conflict of interest. *See* Dkt. 229, at 29–32. Though much of this investigation is privileged, the record indicates that Fluor interviewed Anderson, analyzed his company email account, spoke with several witnesses, inspected public source information, and scrupulously reviewed its internal files. *See id.*; Dkt. 231-18, at 11–12; *see also* Dkt. 231-24.

After learning of Fluor's internal investigation, Anderson sought to minimize the damage. He sent an email on October 28, 2017 to Relyant leadership titled "Anderson Relyant/Relyant Global E-mail Accounts – please disable/delete." Dkt. 231-19, at 4. In this email, he wrote: the "more I [think] about it, it seems to me that a potential liability might be the existence of my e-mail account with Relyant. It's my own fault that I keep using it when I probably should be limiting our e-mail contact to this Gmail account. . . . [It] seems to me prudent that we shut these accounts down..." *Id.*

Anderson also prepared a "Memorandum for Record – Relyant Global and Fluor Conflict of Interest Mitigation" on December 13, 2017" in which he defended his conduct as Fluor's Country Manager. *See* Dkt. 231-20, at 2 ("I have continuously and fully disclosed all potential conflict of interest issues. Furthermore, I have continuously acted with complete professionalism, integrity and transparency regarding my active and inactive business relationships.").

11

Finally, he sent an email on January 21, 2018 to Relyant leadership from his personal email account titled "CLOSE HOLD AND DO NOT FORWARD – Heads Up." Dkt. 231-23, at 2. This email warned that "[a] Fluor investigator will probably be calling . . . regarding the APS and HCN Labor Contract pretty soon." He urged the email's recipient to "obviously [not] let on that I passed this information on to you." *Id.*

Fluor concluded its investigation of Anderson roughly a month and a half later. *See generally* Dkt. 231-24. On March 15, 2018, Fluor recalled Anderson from Afghanistan to Greenville, South Carolina, Dkt. 229-10, at 16, and confronted him with the investigation's findings. At that point, Anderson lost his composure and apologized for his wrongdoing. *See* Dkt. 231-22, at 9–11; Dkt. 231-24, at 3–4. Fluor then terminated him for his "integrity violation that was very significant." *See* Dkt. 229-10, at 19.

Almost immediately following Anderson's termination, Fluor contacted the Office of the Inspector General within the Department of Defense ("DOD-IG") to make a "Notification of Potential Violation" disclosure pursuant to 48 C.F.R. § 52.203-13. *See* Dkt. 231-30. In its communication to the DOD-IG, Fluor outlined Anderson's suspected violation of the federal acquisition regulation's Code of Business Conduct and Ethics. *See id.* Fluor then returned five percent of the value of Anderson's work for the Government, or $75,000. *See* Dkt. 231-33, at 4. Fluor believed this to be an appropriate estimate of the amount of time that Anderson spent on tasks unrelated to LOGCAP IV work that he billed to the Government. *See id.* at 4–8. Fluor thereafter recompeted the HCN contract, and re-awarded it to APS instead of Relyant.

**F. Procedural background**

Anderson sued Fluor on March 13, 2019 for injuries resulting from his termination and Fluor's disclosure of his suspected conflict of interest violations to the DOD-IG. Dkt. 1. Fluor filed its answer and counterclaimed on May 21, 2019. Dkt. 11. The parties amended their

pleadings prior to discovery to account for, *inter alia*, privilege issues. Cross-motions for summary judgment were filed on June 5, 2020. Dkts. 224, 226. The matter is now ripe for review.

### III.   <u>LEGAL STANDARD</u>

Summary judgment will be granted where, viewing the facts in a light most favorable to the non-moving party, there remains no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Marlow v. Chesterfield Cty. Sch. Bd.*. 749 F. Supp. 2d 417, 426 (E.D. Va. 2010). A party opposing a motion for summary judgment must respond with specific facts, supported by proper documentary evidence, showing that a genuine dispute of material fact exists and that summary judgment should not be granted in favor of the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). As the Supreme Court has held, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir. 2003) (quoting *Anderson*, 447 U.S. at 247–48) (emphasis in original).

### IV.   <u>DISCUSSION</u>

#### A. Anderson's motion for summary judgment

Anderson motions for summary judgment on each of Fluor's counterclaims. *See generally* Dkts. 225. These counterclaims include Counts I and II (Fraud and Constructive Fraud), Count III (Unjust Enrichment), Count IV (Tortious Interference with Existing and Prospective Contractual Relationships), Count V (Breach of Contract), Count VI (Breach of Duty of Loyalty), Count VII (Virginia Uniform Trade Secrets Act ("VUTSA") Violations), Count VIII (Federal Defend Trade Secrets Act ("DTSA") Violations), Count IX (Statutory Conspiracy).

Fluor does not oppose summary judgment on Counts IV, VIII, and IX. *See* Dkt. 247, at 10 n.1. Fluor also concedes that punitive damages are not an available remedy for its breach of contract counterclaim. *Id.* at 45 n.12 (citing Dkt. 225, at 33). However, it opposes summary judgment on the remaining counterclaims as originally alleged in its operative pleading. *See generally id.*

### i. Counts I and II (Fraud and Constructive Fraud)

A plaintiff claiming fraud "bears the burden of proving by clear and convincing evidence the following elements: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*, 507 S.E.2d 344, 346 (Va. 1998) (citing *Evaluation Research Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994)).

Virginia law "recognizes fraud by omission, sometimes called 'concealment.'" *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 827 (4th Cir. 1999). "[C]oncealment, whether by word or conduct, may be the equivalent of a false representation because it always involves deliberate nondisclosure designed to prevent another from learning the truth." *Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 629 (4th Cir.1999) (citing *Van Deusen v. Snead*, 441 S.E.2d 207, 209 (Va. 1994)); *see also Metrocall of Del., Inc. v. Cont'l Cellular Corp.*, 437 S.E.2d 189, 193 (Va. 1993) (observing that concealment of a fact while "knowing that the other party is acting on the assumption that no such fact exists, is as much fraud as if the existence of the fact were expressly denied").

The elements of a fraud claim are consistent with the elements of a constructive fraud claim with the exception that, in a constructive fraud claim, a Plaintiff may alternatively prove "that a false representation of a material fact was made innocently or negligently." *Henderson v.*

14

*Henderson*, 495 S.E.2d 496, 499 (Va. 1998).

Anderson argues that he is entitled to summary judgment on Fluor's fraud claims for three reasons: (1) Fluor cannot demonstrate that he misrepresented or omitted his conflicts of interest; (2) Fluor relied unreasonably and unjustifiably on his alleged misrepresentations or omissions, and; (3) Fluor was not injured by Anderson's alleged misrepresentations or omissions. *See* Dkt. 225, at 19–24.

### 1. Anderson's misrepresentations or omissions of his conflicts of interest

Anderson challenges Fluor's assertion that he misrepresented, or failed to disclose, his alleged conflicts of interest.[5] Dkt. 225, at 20. The Court disagrees with Anderson, and finds this to be a jury triable issue. At minimum, the record evidence gives rise to a genuine dispute of material fact.

There is certainly evidence cutting in Anderson's favor:

- In March 2016, Fluor employee Kevin Leonard suggested the need to "discuss [Anderson's] part of Relyant (Future)" in an email involving Anderson and five Fluor hiring staffers. Dkt. 225-5, at 2.
- In response to that email, Anderson privately told Kevin Leonard that he wished to retain his ownership stake in VHG and Relyant. Dkt. 225-11, at 1.
- Anderson informed John Murphree, a Fluor subcontracting staffer in Bagram, that "he'd been permitted to retain a small financial interest in Relyant." Dkt. 231-16, at 7.
- Anderson told Robert Walsh, a Fluor subcontracting staffer in Bagram, that he "owned stock in a holding company" called VHG. Dkt. 225-37, at 17.
- Anderson disclosed his interest in Relyant when he mentioned his 6.5% stake in VHG

---

[5] Throughout his argument, Anderson insists that Fluor lacks "clear and convincing evidence" of the requisite elements of fraud and constructive fraud. Fluor need not prove elements by "clear and convincing evidence" at this stage in the proceedings. That comes at trial. According to Virginia law, the Court can grant summary judgment on a fraud or constructive fraud claim only "if it determines that no reasonable jury *could find* fraud by clear and convincing evidence." *Lake Wright Hosp., LLC v. Holiday Hosp. Franchising, Inc.*, 2009 WL 2606254, at *32 (E.D. Va. Aug. 20, 2009) (emphasis added); *see also Eltsefon v. State Farm Mut. Auto. Ins. Co.*, 2012 WL 13019507, at *3 (E.D. Va. Mar. 9, 2012) ("Summary judgment is properly awarded to a defendant in a fraud action where the plaintiff fails to adduce sufficient evidence *which would allow a fact-finder to conclude* by clear and convincing evidence that each of the elements of fraud is present.") (emphasis added) (internal quotation marks omitted).

to Fluor employees Don Yenovkian and Greg Bauman after Fluor awarded Relyant the HCN subcontract. Dkt. 231-13, at 2.

But there is also evidence suggesting that Anderson apportioned information to Fluor in a manner calculated to obscure the true nature of his relationship with Relyant:

- Don Yenovkian testified that Anderson told him that he "sold all interest in Relyant [before he] was hired with Fluor." Dkt. 229-26, at 25.

- When Anderson "came clean" to Don Yenovkian about his stake in Relyant through VHG in August 2017, he did not mention his ongoing consulting arrangement with Relyant. *See* Dkt. 231-13, at 2. In fact, there is no evidence that Anderson ever disclosed an ongoing paid consulting arrangement with VHG/Relyant to Fluor, until Fluor uncovered this information during its internal investigation.

- Anderson told Fluor in August 2017 that he had "avoided all dealings with Relyant Global to the maximum extent possible." Dkt. 231-13, at 2.

- Anderson certified that he had no conflicts of interest when completing four Fluor Code of Business Conduct and Ethics certifications. *See* Dkt. 229-13; Dkt. 229-18; Dkt. 229-19; Dkt. 229-20.

- Anderson told John Murphree he was no longer on Relyant's board of directors, and did not tell him that he was a paid consultant for Relyant. Dkt. 231-16, at 8.

- Even though Anderson told Robert Walsh about his stake in VHG, Anderson never explained to Walsh the ownership structure and relationship between VHG and Relyant to Walsh's recollection. Dkt. 229-8, at 14.

The factfinder must resolve this conflicting evidence to determine whether Anderson misrepresented his conflicts of interest to Fluor.

### 2. The reasonableness of Fluor's reliance on Anderson's misrepresentations

Anderson also argues that Fluor's fraud Counts fail because Fluor cannot prove that it reasonably or justifiably relied on any alleged misrepresentations or omissions by Anderson. Dkt. 225, at 21 (citing *Hitachi*, 166 F.3d 614, 629 (4th Cir. 1999)).

In Virginia, the "touchstone of reasonableness is prudent investigation." *Hitachi*, 166 F.3d at 629. The case of *Elliott v. Great Point Partners, LLC* outlines several circumstances in which "reliance cannot be reasonable in the absence of prudent investigation":

One settled instance in which reliance is unreasonable is where a plaintiff "makes a

16

partial inquiry, with full opportunity of complete investigation, and elects to act upon the knowledge obtained from the partial inquiry." *Hitachi*, 166 F.3d at 629. Another is where a party specifically disclaims reliance on its counterparty's representation it asserts as fraudulent. *Bank of Montreal*, 193 F.3d at 830. Another is where a party had information that would excite the suspicions of a reasonably prudent person. *See White v. Potocska*, 589 F. Supp. 2d 631, 652 (E.D. Va. 2008). Yet another is where one relies upon an oral statement that is contrary to a written statement in his possession. *See Foremost Guaranty Corp. v. Meritor Savings Bank*, 910 F.2d 118, 126 (4th Cir.1990).

2011 WL 63657, at *4 (E.D. Va. Jan. 5, 2011).

By these standards, the Court finds that conflicting evidence forecloses summary judgment on the issue of Fluor's reasonable reliance on Anderson's alleged misrepresentations at all relevant times except for the period ranging from August 8, 2017 through mid-December 2017, when Fluor began its privileged internal investigation of Anderson. *See* Dkt. 247, at 38 n.8.

During March 2016, two months before Anderson was hired, he uploaded his resume to Fluor's internal system. Dkt. 225-4, at 3–4. His resume listed him as an "owner" of Relyant LLC.[6] Around the same time, Kevin Leonard, a former Fluor employee, mentioned the need to discuss Anderson's "part of Relyant" to several Fluor staffers in a group email conversation involving Anderson during Anderson's pre-employment negotiations. *See* Dkt. 225-5, at 2.

On the other hand, Fluor's Director of Human Resources attests that in the subsequent months, Fluor "communicated with Anderson regarding his potential hiring[,] and based on those discussions, [Fluor] understood that Anderson was divesting all of his interest and involvement in Relyant, and would have no future involvement with Relyant once he joined Fluor." Dkt. 229-25, at 3. Moreover, Fluor, as a matter of course, relies on employee certifications to prompt inquiry into potential conflicts of interest. *See* Dkt. 247-5, at 5. This owes to Fluor's enormous

---

[6] The court assumes Anderson meant "Relyant Global, LLC." Relyant LLC was no longer a viable entity as of 2014. Dkt. 231-20, at 9.

size as an employer of tens of thousands of employees. *See* Dkt. 247-5, at 6 (Deposition of David Methot, Fluor's Chief Compliance Officer) ("We can't track e-mails and informal documentation. We have a formal process, it's an annual certification process that starts when the employee walks in the door. If they say they don't have a conflict of interest and that they will tell their supervisor whether they do have one, then we don't follow up with that, regardless of anything they may say, because that's the certification that matters."). This explains why Fluor did not investigate Anderson's potential conflicts of interest after he certified that he "[did] not have a conflict of interest" on April 4, 2016. Dkt. 229-13.[7]

A reasonable factfinder could therefore find that Fluor reasonably relied on Anderson's misrepresentations based on his (1) assurances to Fluor's Director of Human Resources that he had divested his ownership stake in Relyant, and (2) certification of Fluor's Code of Business Conduct and Ethics. Anderson purportedly made both these representations after he and Leonard intimated his ownership stake in Relyant, but before Fluor hired him.

A genuine dispute of material fact also precludes summary judgment on the issue of whether Yenovkian's failure to detect Anderson's looming conflict of interest with Relyant in December 2016 rendered Fluor's reliance on Anderson's alleged misrepresentations unreasonable at that time.

There is no doubt that Don Yenovkian failed to perform important duties. In late 2016 and early 2017, Anderson repeatedly asked Yenovkian for a written mitigation plan regarding Ultralife after Yenovkian interviewed Anderson about his potential conflicts of interest on December 8, 2016. *See* Dkt. 225-18, at 9–10. Yenovkian never prepared this mitigation plan for Anderson. *See* 225-39, at 12–13.

---

[7] Anderson also certified that he did not have a potential conflict of interest on May 11, 2016 immediately after he was hired. Dkt. 229-18, at 2.

Still, Yenovkian's unresponsiveness to Anderson's repeated requests for an Ultralife mitigation plan had nothing to do with the reasonableness of Fluor's reliance on Anderson's alleged misrepresentations regarding Relyant. Yenovkian attests that Anderson told Yenovkian in December 2016 that he had "sold all interest in Relyant [before he] was hired with Fluor." *See* Dkt. 229-26, at 25. By arguing that Fluor's reliance on this alleged misrepresentation or omission was unreasonable, Anderson implies that Fluor should have assumed that every statement Anderson made during his December 2016 interview with Yenovkian was a misrepresentation. *See* Dkt. 225, at 23. Fluor cannot be faulted for failing to scrutinize every comment made by Anderson, when Anderson appeared to be undertaking a good faith effort to "come clean." Thus, a reasonable jury could find that Fluor had no reason to doubt the veracity of Anderson's representations in December 2016 regarding his divestiture of his ownership stake in Relyant.

However, on August 8, 2017, Anderson disclosed his ownership interest in VHG in an email to Yenovkian, but Yenovkian did not read the full email. *See* Dkt. 249, at 14; Dkt. 225-41, at 1; *see also* Dkt. 229-26, at 35 (Deposition of Don Yenovkian) ("Q: Why did you feel like you didn't have to [keep reading Anderson's message]? A: This was old news to me. I knew there wasn't an ongoing issue with Relyant . . . And I was on vacation."); *see also id.* at 38 ("I mean, bottom line is I missed it.").

Whether this disclosure should have "excited the suspicions of a reasonably prudent" employer as a matter of law is a close call. *See White*, 589 F. Supp. 2d at 652 (citing *Poe v. Voss*, 86 S.E.2d 47 (1955)). But the Court finds that Anderson's actual disclosure of his stake in VHG and Relyant in August 2017 put Yenovkian and, by extension, Fluor on notice of the need to scrutinize Anderson's split loyalties. This is especially true considering Yenovkian's

19

testimony that Anderson had previously told him that he divested his stake in Relyant. *See* Dkt. 229-26, at 25. Had Fluor probed the issue, it could have uncovered all the information it later learned in its internal investigation after receiving Tod Nickles's letter of concern on October 17, 2017. *See* Dkt 231-24. Thus, the Court finds that no reasonable factfinder could conclude that Fluor performed a reasonably prudent investigation of Anderson's alleged misrepresentations after Yenovkian was notified of Anderson's existing stake in Relyant. This is true even though Relyant and Anderson were both actively misleading Fluor about their relationship at the time. *See* Dkt. 230-14, at 2; Dkt. 231-13, at 2.

The Court therefore grants partial summary judgment to Anderson with respect to his alleged fraud between August 8, 2017 and mid-December 2017. *See* Dkt. 247, at 32 n.8. An open question exists as to whether Fluor, in fact, suffered any damages during this period. *Id.* By then, the HCN task order was already awarded to Relyant, Dkt. 225, at 13, ¶ 67, and Anderson had already allegedly revealed competitor pricing information to Relyant, Dkt. 230-4, at 8–9; Dkt. 230-19, at 2.

### 3. Whether Anderson's misrepresentations and omissions caused Fluor Damage

Anderson argues that Fluor cannot prove that his alleged misrepresentations or omissions injured Fluor.[8] Anderson specifically argues (1) that Fluor cannot recover monies the Government ultimately paid to Anderson as compensation for his service as Fluor's Country Manager, (2) that Fluor voluntary incurred the cost of recompeting the HCN solicitation, and (3) that Anderson's alleged misrepresentations and omissions were not the "but for" cause of Fluor's recompete of the HCN solicitation. Dkt. 225, at 23–25; Dkt. 249, at 19.

---

[8] This issue arises throughout Anderson's motion for summary judgment. *See* Dkt. 249, at 6 ("Fluor's remaining counterclaims fail for at least one common reason: Fluor has no evidence that it suffered any cognizable harm, injury, or damages as a proximate result of any alleged misconduct on the part of BG Anderson.").

20

On the <u>first</u> issue, the Court finds that the collateral source rule does not bar Fluor's recovery of fraud damages from Anderson. There is no doubt that "Anderson's compensation as Fluor's Country Manager in Afghanistan ultimately was paid by the U.S. Army and not Fluor." Dkt. 225, at 23. But Anderson oversteps by insisting that Fluor's "quantum of damages" should be reduced by the monies it "receive[d] from other sources of compensation that are independent of (or collateral to)" Anderson. *See Davis v. Odeco, Inc.*, 18 F.3d 1237, 1243 (5th Cir. 1994).

Though the Virginia Supreme Court recognizes that the collateral source rule is not limitless, *Dominion Resources, Inc. v. Alstom Power, Inc.*, 825 S.E.2d 752, 754 (Va. 2019), it has yet to define the rule's exact scope, and has not spoken to whether the rule applies to cost-reimbursement government contracts. To the Court's knowledge, no sound legal or policy basis counsels against applying the rule to these facts. As Fluor observes, the rule does not differentiate between the nature of benefits (i.e., compensation versus reimbursement). *See Bullard v. Alfonso*, 595 S.E.2d 284, 286–87 (Va. 2004). Sister state courts have applied the rule to cost-reimbursement government contracts. *See United Aircraft Corp. v. Int'l Ass'n of Machinists*, 285 A.2d 330, 343 (Conn. 1971). Axiomatic legal principles favor limiting the number of parties involved in the dispute and recovery of damages. *See Southern Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533 (1918) ("The general tendency of the law, in regard to damages at least, is not to go beyond the first step."). Finally, common sense and policy considerations suggest that application of the collateral source rule is reasonable in this case. Specifically, Anderson would receive a windfall if the Court barred Fluor from recovery based on his alleged fraud. The United States Army has not yet requested repayment, but still might. And a ruling that forces the Government to recover lost value from Anderson on a theory of subrogation or as a third-party beneficiary would introduce needless complexity into an

already convoluted imbroglio of a dispute, especially given that Fluor has already vowed to "pass along" any recovery for costs the Government wrongfully reimbursed. *See* Dkt. 247, at 41.

The Court therefore rejects Anderson's invitation to sidestep a straight-forward application of Virginia's collateral source rule where fraud is raised in connection with a cost-reimbursement government contract.

Anderson's <u>second</u> line of argument asserts that Fluor "did not have to incur the costs of recompeting the HCN Subcontract a second time."[9] Dkt. 225, at 24. He states that Fluor "could have simply removed Relyant as a bidder and awarded the HCN Subcontract based on the submissions and presentations made in the first recompetition of the HCN Subcontract . . . Thus, these alleged damages were not proximately caused by any alleged misrepresenting or omissions[.]" *Id.*

Anderson's argument fails to track Fluor's fraud claims, which outline damages stemming from the *initial* HCN solicitation that Fluor was "forced to cancel as a result of Anderson's conduct, not the costs of a subsequent re-competition." Dkt. 247, at 41; *see also* Dkt. 119-1, at 59, ¶ 119 ("Fluor has suffered actual, consequential, and compensatory damages . . . including . . . the costs and expenses incurred in competing the solicitation *that ultimately was cancelled.*") (emphasis added). Based on the relief Fluor seeks, Anderson "bears the burden of proving that [Fluor] failed to mitigate [the] damages" associated with the second recompete. *See Monahan v. Obici Med. Mgmt. Servs., Inc.*, 628 S.E.2d 330, 336 (Va. 2006). A reasonable jury

---

[9] For clarity, the Court reiterates the timing of the HCN solicitation recompetes. The first recompete occurred as a matter of course, and was first announced in October 2016. *See* Dkt. 249, at 23 ("It is undisputed that Fluor publicly announced it was recompeting the HCN subcontract, and by extension was willingly incurring the costs of the competition, on October 11, 2016."). Relyant submitted an initial bid for this subcontract on November 1, 2016. Dkt. 229, at 22. However, because of a suicide bombing at Bagram Airfield in November 2016, the HCN solicitation was delayed until Spring 2017, with bidders submitting their final proposals on April 17, 2017. Dkt. 229, at 22, ¶ 30. When Fluor uncovered the full extent of Anderson's business relationship with Relyant in early 2018, it cancelled the first HCN award. *See* Dkt. 247-17, at 4, ¶ 7. Fluor then decided to recompete the HCN solicitation a second time, and awarded the contract to APS on June 15, 2018. *See id.* ¶ 8.

22

could find that Fluor did not fail to mitigate its damages because Fluor reasonably concluded that recompeting the solicitation was in its best business interest after disqualifying Relyant based on an "actual conflict of interest between Mr. Anderson and Relyant." *See* Dkt. 247-17, at 4, ¶ 7 (Declaration of Greg Bauman, Fluor's Functional Director, Procurement and Subcontracts). There are many possible explanations for why a recompete of the HCN solicitation was necessary for Fluor. For example, Fluor selected its HCN subcontractor, in part, based on highly consequential in-person presentations given by three candidates in Dubai that had been down-selected from the initial field of seven bidders. *See* Dkt. 231-27, at 2 ("Regarding the labor award, looked into it today and was advised award will occur [no later than] 1 July; seven bidders[.]"); Dkt. 231-11, at 2 ("Other than a general update . . . wanted to make sure you knew the good news that [Relyant] has made the cut to final stage (3 companies) on the Host Nation Labor contract. There will be meetings in Dubai early next week with our subcontracts and site management team and it will be EXTREMELY important [Relyant] puts it's [sic] best foot forward."). Relyant was one of the candidates that presented in Dubai. Dkt. 231-4, at 3. Had Relyant been excluded from the bidder's list, another company would have assumed the third slot, and would have been afforded the opportunity to sway Fluor's selection panel in Dubai. Fluor may have therefore decided to recompete the contract to promote current and prospective subcontractor confidence in Fluor's "fair and competitive procurement" processes. *See* Dkt. 247, at 42.

Given Anderson's burden of proof in asserting his affirmative defense of damages mitigation, the factfinder, not the Court, must decide whether Fluor's business decision to recompete the HCN solicitation was reasonable.

Anderson's <u>third</u> damages argument contends that his alleged misrepresentations and

23

omissions were not the "but for" cause of Fluor's cancellation of the first HCN solicitation.[10]

Fluor offers enough evidence to rebut this position and make it an issue for the factfinder.

Fluor's Functional Director of Procurement and Subcontracts attests that if Fluor knew the full

extent of Relyant's relationship with Anderson, it would have disqualified Relyant from the

HCN solicitation from the start. *See* Dkt. 247-17, at 4, ¶ 7 ("Had I known that Mr. Anderson had

an ongoing relationship with and an interest in Relyant, I would have instructed that Relyant not

be included on the bidder's list for the HCN solicitation."). Fluor's internal policies lend support

to this position, given the company's strict adherence to federal acquisition regulations. *See* Dkt.

231-18, at 4–6, ¶¶ 7–10 (citing 48 C.F.R. § 52.203-13). Thus, Fluor's position that Anderson's

alleged misrepresentations and omissions were the cause in fact of its cancellation of the first

HCN solicitation is not "pure speculation." *Contra* Dkt. 249, at 19 (citing *WorldCom, Inc. v.

Boyne*, 68 F. App'x 447, 453 (4th Cir. 2003)).

In sum, the Court cannot find, as a matter of law, that no genuine dispute of material fact

exists as to whether Fluor suffered damages as a result of Anderson's alleged fraud.

\* \* \*

The Court grants partial summary judgment to Anderson on Counts I and II for the period

ranging from August 8, 2017 to mid-December 2017. However, Fluor may recover damages on

these Counts stemming from Anderson's alleged misrepresentations and omissions that occurred

before August 8, 2017.

---

[10] Anderson's "but for" argument, in fact, focuses on the HCN recompete. *See* Dkt. 249, at 19 ("[T]here is no evidence that, but for BG Anderson's alleged misrepresentations or omissions, Fluor would not have *recompeted* the HCN subcontract and voluntarily incurred the costs of competition.") (emphasis added). However, because the reasonableness of Fluor's recompete of the HCN solicitation is an issue of damages mitigation to be proved at trial by Anderson as an affirmative defense, and because Fluor claims damages based on the cancellation of the first HCN solicitation, any "but for" argument must pertain to the first HCN solicitation.

### ii. Count III (Unjust Enrichment)

The elements of unjust enrichment in Virginia include "(1) a benefit conferred on the defendant by the plaintiff; (2) knowledge on the part of the defendant of the conferring of the benefit; and (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefits without paying for its value." *Wright v. Cangiano*, 1993 WL 946172, at *1 (Va. Cir. Ct. 1993) (citing *Nossen v. Hoy*, 750 F. Supp. 740, 744 (E.D. Va. 1990)); *see also Schmidt v. Household Fin. Corp., II*, 661 S.E.2d 834, 838 (Va. 2008) ("To state a cause of action for unjust enrichment, Schmidt had to allege that: (1) he conferred a benefit on Household Finance; (2) Household Finance knew of the benefit and should reasonably have expected to repay Schmidt; and (3) Household Finance accepted or retained the benefit without paying for its value."). Unjust enrichment sounds in equity, and exists to supply a Plaintiff with a remedy for a wrong suffered that cannot be redressed at law. *See Cangiano*, 1993 WL 946172, at *1 (citing *Kern v. Freed Co., Inc.*, 299 S.E.2d 363, at 364–65 (Va. 1983)).

The Court grants summary judgment to Anderson on Count III because Fluor fails to demonstrate its entitlement to a specific non-contractual benefit that Anderson wrongfully obtained while employed as Fluor's Country Manager in Afghanistan.

Fluor concedes in its response that it is not seeking monies "Anderson received from other companies." *Compare* Dkt. 247, at 42 n.10, *with* Dkt. 119-1, at 62–63, ¶ 135. Fluor also lacks any entitlement to recovery of the financial benefits Anderson derived from the increased value of his holdings in businesses he marketed as Fluor's Country Manager. *See John C. Holland Enterprises, Inc. v. J.P. Mascaro & Sons, Inc.*, 653 F. Supp. 1242, 1246 (E.D. Va. 1987) (citing *City of Norfolk v. Norfolk Cty.*, 91 S.E. 820, 825–27 (Va. 1917)), *aff'd*, 829 F.2d 1120 (4th Cir. 1987).

That leaves only the compensation Fluor paid to Anderson while he was working on non-Fluor matters. *See* Dkt. 247, at 43 ("Fluor clearly had a preexisting right to the money that it pays to its employee as compensation."); *see also id.* at 42 n.10 ("Anderson unjustly enriched himself by accepting a Fluor salary while engaged in conduct to benefit himself."). This compensation must be recovered in a legal action based on the parties' written employment agreement, not under a theory of quantum meruit.[11] *See Mongold v. Woods*, 677 S.E.2d 288, 292 (Va. 2009) ("[T]o award a quantum meruit recovery, the court must conclude that there is no enforceable express contract between the parties covering the same subject matter. In such a case, the court will imply a contract between the parties to prevent inequity; when such an express contract exists, however, there is no need to imply one because the parties have already negotiated an agreement."); *Haynes Chem. Corp. v. Staples & Staples*, 112 S.E. 802, 804 (Va. 1922) ("Where one renders services for another at the latter's request the law, *in the absence of an express agreement*, implies a promise to pay what those services are reasonably worth, unless it can be inferred from the circumstances that those services were to be rendered without compensation.") (emphasis added).

Accordingly, Anderson is entitled to summary judgment on Count III.

### iii. Count V (Breach of Contract)

Under Virginia law, *Dixon v. Edwards*, 290 F.3d 699, 710 (4th Cir. 2002), "[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a

---

[11] The Court notes that while Fluor demonstrates that Anderson conducted non-Fluor business during Anderson's typical Fluor workday, Dkt. 229-1, at 1–2, Anderson was hired as an exempt employee, *see* Dkt. 229-5, at 3, and Fluor's internal documents impliedly authorize employees to "moonlight" for other companies, so long as no conflict of interest exists, *see* Dkt. 229, at 18; Dkt. 229-37, at 21. Fluor estimates that five percent of Anderson's "billable" time was spent on non-Fluor business interests. *See* Dkt. 231-33, at 5–7. However, Fluor does not assert a breach of contract claim based on this amount, *see* Section IV.A.iii, and so the Court will not issue an advisory opinion on this matter.

plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004).

Fluor alleges that Anderson caused actual damages by breaching his obligation not to disclose Fluor's non-public highly confidential and proprietary information to individuals who were not entitled to that information. Dkt. 119-1, at 65–66, ¶¶ 147–149, 153. However, the only "actual damages" to which Fluor points are the costs of the *first* HCN solicitation, *see* Dkt. 247, at 45, which Fluor concedes the government reimbursed, *see id.* Fluor cites *Dominion Resources, Inc. v. Alstom Power, Inc.* to argue that the collateral source rule allows it to recover these damages. *See id.* (citing 825 S.E.2d 752, 756–77 (Va. 2019)).[12] The Court disagrees.

*Dominion Resources* does not stand for the proposition that the collateral source rule applies expansively to breach of contract claims, which operate to protect parties' bargained-for expectations. *Filak*, 594 S.E.2d at 613. Rather, *Dominion Resources* suggests that Virginia's collateral source rule applies in limited circumstances in which "a party has paid valuable consideration before the breach to a collateral source to insure against a loss or otherwise to protect its interest[.]" 825 S.E.2d at 272 (quoting *John Munic Enterprises, Inc. v. Laos*, 326 P.3d 279, 285 (Ariz. Ct. App. 2014)); *see also id.* ("There is no logical reason to deny [a] party a benefit it has paid for and grant it to another party who neither negotiated for it, paid for it, nor absorbed the opportunity costs for securing it, but who has participated in the loss."). Accordingly, just because "the collateral source rule may apply in the breach-of-contract context

---

[12] Fluor's legal strategy is sound. With its eye on fraud damages, Fluor tightens the causal relationship between Anderson's alleged misrepresentations and the damages it suffered by seeking the recovery of costs and expenses associated with the *first* HCN solicitation in Counts I and II. *Id.* at 35. This increases Fluor's total potential recovery, but precludes it from seeking contract damages in connection with the *second* HCN recompete in Count III. *See id.* at 45. Fluor must therefore argue that the collateral source rules allows it to recover the costs and expenses associated with the *first* recompete, consistent with contract law.

27

does not mean that the rule [should] apply in every case, or even most cases." *See id.* at 273.

Analyzing this dispute in the "case-specific" manner prescribed by the Virginia Supreme Court, *id.* at 274, the Court finds no reason to apply the collateral source rule to Fluor's breach of contract claim. Fluor incurred no specific costs to insure it against the financial risk of cancelling the first HCN solicitation. In fact, the Government's reimbursement of the solicitation's costs was as a matter of course, and simply fortuitous. Double recovery would not protect Fluor's bargained-for expectations in this scenario, but would instead result in a windfall. Anderson is therefore entitled to summary judgment because Fluor fails to present any evidence of damages resulting from Anderson's breach of the parties' non-disclosure agreement.

### iv.  Count VI (Breach of Duty of Loyalty)

All employees, including those at-will, owe a common law fiduciary duty of loyalty to their employers. *See Integrity Auto Specialists, Inc. v. Meyer*, 2011 WL 8964509, at *6 (Va. Cir. Ct. 2011) (citing *Williams v. Dominion Tech. Partners, LLC*, 576 S.E.2d 752, 757 (Va. 2003)). Consistent with this duty, an employee cannot maintain and further an interest in subject matter adverse to his employer. *Zuccari, Inc. v. Adams*, 1997 WL 1070565, at *4 (Va. Cir. Ct. 1997) (citing *Greenspan v. Osheroff*, 351 S.E.2d 28, 37 (1986)). If he does, "equity will . . . compel him to convey to his associate a proper interest in the property or to account to him for the profits derived therefrom." *Greenspan*, 351 S.E.2d at 37 (citing *Horne v. Holley*, 188 S.E. 169, 172 (Va. 1936)). While a "policy of free competition" somewhat tempers this duty, the importance of "integrity and fairness attaching to the relationship between employer and employee" precludes employees from acting in unabashed self-interest at their employer's expense. *See Dominion Tech. Partners*, 576 S.E.2d at 757 (citing *Feddeman & Co. v. Langan Assoc.*, 530 S.E.2d 668, 672 (Va. 2000)).

As an initial matter, the Court finds Fluor's Count VI preempted by the Virginia Uniform

Trade Secrets Act ("VUTSA") to the extent it asserts claims based on Anderson's alleged misappropriation of JSI, APS, and Ecolog pricing information in Fluor's possession.

VUTSA displaces "conflicting tort, restitutionary, and other [Virginia] law . . . providing civil remedies for misappropriation" if, and only if, a Defendant misappropriates a VUTSA "trade secret." *See* Va. Code 59.1-341; *see Int'l Paper Co. v. Gilliam*, 63 Va. Cir. 485, 490 (Va. Cir. Ct. 2003) ("The VUTSA does not preempt alternative tort recovery unless it is clear that the price list falls within the confines of the Act."); *Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co.*, 191 F. Supp. 2d 652, 659 (E.D. Va. 2002) ("The plain meaning of the statute, coupled with decisions interpreting similar preemption provisions in the context of a motion to dismiss, make it apparent that, unless it can be clearly discerned that the information in question constitutes a trade secret, the Court cannot dismiss alternative theories of relief as preempted by the VUTSA.").

Courts hesitate to assign the label of "VUTSA trade secret" to proprietary information at the pleadings stage for fear of depriving parties the opportunity to conduct fact-finding on the issue. *See, e.g., Int'l Paper Co.*, 2003 WL 23573613, at *4; *Bonumose Biochem, LLC v. Yi-Heng Zhang*, 2018 WL 10069553, at *18 (W.D. Va. May 21, 2018), *report and recommendation adopted*, 2018 WL 10068672 (W.D. Va. June 11, 2018); *AWP, Inc. v. Commonwealth Excavating, Inc.*, 2013 WL 3830500, at *7 (W.D. Va. July 24, 2013); *Stone Castle Fin., Inc.*, 191 F. Supp. 2d at 656–59.

However, similar concerns do not abound on summary judgment. By now, the parties have completed extensive discovery, all of which indicates that the JSI, APS, and Ecolog pricing information meets Va. Code § 59.1-336's definition of a trade secret.[13] *See, e.g.*, Dkt. 229-8, at

---

[13] VUTSA defines a "trade secret" as "[i]nformation, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that (1) derives independent economic value, actual or potential,

29

12; Dkt. 229-9, at 5; *id.* at 7; Dkt. 229-14, at 22; Dkt. 229-15, at 2; Dkt. 229-21, at 14–15; Dkt. 230-4, at 10–11; Dkt. 230-8, at 13; Dkt. 230-11, at 3; Dkt. 231-9, at 3; Dkt. 231-10, at 4–5. Courts in this Circuit have recognized that competitor pricing data, like the kind Anderson disclosed to Relyant, constitutes a VUTSA trade secret, even at the pleadings stage. *See OROS, Inc. v. Dajani*, 2019 WL 2361047, at *3 (E.D. Va. June 4, 2019) (competitor pricing information qualifies as trade secret for purposes of VUTSA on a motion to dismiss) (citing *Spirax Sarco, Inc. v. SSI Eng'g, Inc.*, 122 F. Supp. 3d 408, 426 (E.D.N.C. 2015)). The Court does not hesitate to make a similar finding here.

Even if there was a question as to whether the JSI, APS, and Ecolog pricing information qualifies as a VUTSA trade secret, Fluor cannot argue against this position for purposes of Count VI while advocating for it in Count VII. *See* Dkt. 119-1, at 67, ¶¶ 161–64; *see also* Dkt. 247, at 50 (challenging Anderson's assertion that "Fluor . . . cannot prove that any of the information at issue constitutes trade secrets"). Fluor must take the bitter with the sweet; it cannot assume a contradictory litigating position regarding the legal status of this pricing information without arguing in the alternative.

Because the JSI, APS, and Ecolog pricing information is a VUTSA trade secret, VUTSA displaces Fluor's tort claims premised on Anderson's alleged misappropriation thereof. This is true even if VUTSA offers a lesser remedy, or no remedy at all. *See Smithfield Ham and Prods, Co., Inc. v. Portion Pac, Inc.*, 905 F. Supp. 346, 348 (E.D. Va. 1995) ("The plain language of [VUTSA's] preemption provision indicates that the law was intended to prevent inconsistent theories of relief for the same underlying harm by eliminating alternative theories of common

---

from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Va. Code § 59.1-336.

law recovery which are premised on the misappropriation of a trade secret."); *see also* Richard F. Dole Jr., *Preemption of Other State Law by the Uniform Trade Secrets Act*, 17 SMU Sci. & Tech. L. Rev. 95, 106–07 (2014) ("[C]laims providing different remedies for business information that is a Uniform Act trade secret . . . would enable parties to circumvent the Uniform Act [by] mak[ing] the Uniform Act remedies irrelevant.") (citing James Pooley, Trade Secrets § 2.03[6] at 2.30.1 (1997)).

Thus, to recover for Anderson's alleged breach of loyalty on Count VI, Fluor "must . . . demonstrate that the distinct theories of relief [asserted in its breach of loyalty claim] are supported by facts unrelated to [Anderson's] misappropriation of [its] trade secret[s]." *See Rogers Elec. of Virginia, Ltd. v. Sims*, 2015 WL 13589667, at *3 (Va. Cir. Ct. 2015). It can point to two sets of facts that meet this requirement: (1) the instances in which Anderson "exploited his position as Fluor's Country Manager" to benefit non-Fluor businesses in which he maintained a financial interest, and (2) Anderson's consulting arrangement with Relyant. *See* Dkt. 247, at 46 (citing Restatement (Third) of Agency § 8.02 (2006)); *see also id.* at 46–48.

As to the first set of facts, Anderson unequivocally disclosed his ongoing relationship with Ultralife to Fluor's compliance team in August 2016, more than two months before Fluor submitted its Cost Avoidance Measure ("CAM") proposal to retrofit diesel fuel-powered light sets at Bagram Airfield with solar-powered light sets containing Ultralife batteries. *Compare* Dkt. 229, at 18, ¶ 18, *with id.* ¶ 19, *and* Dkt. 229-7, at 11. This disclosure precludes Fluor from now suing Anderson based on his alleged use of his position with Fluor to support the CAM proposal. *See Constr. Techniques, Inc. v. Dominske*, 928 F.2d 632, 638 (4th Cir. 1991) (citing Restatement (Second) of Agency § 390 cmt. a (1958) for the proposition that "[o]ne employed as an agent violates no duty to the principal by acting for his own benefit if he makes a full

31

disclosure of the facts to an acquiescent principal and takes no unfair advantage of him"); *see also* Dkt. 253-2, at 2–3 (citing approvingly to *Dominske*). Fluor had constructive knowledge of Anderson's relationship with Ultralife as of August 2016, and allowed him to support the CAM proposal in October 2016. Fluor did not even provide Anderson with an Ultralife conflict mitigation plan after Anderson asked for one in the subsequent months. This all suggests that Fluor acquiesced to Anderson's conduct, and cannot now challenge it as a breach of his duty of loyalty. *See* Dkt. 225-39, at 12–13; *Dominske*, 928 F.2d at 638.[14]

The same cannot be said of Anderson's consulting arrangement with Relyant, which he concealed from Fluor. *See* Dkt. 225-41. This arrangement imposed on Anderson a duty that was fundamentally in conflict with his fiduciary obligations to Fluor. *See Dominske*, 928 F.2d at 638.[15] An "irreconcilable tension" arose; Anderson committed himself to supporting both sides of a zero-sum transactional relationship, as Relyant was Fluor's subcontractor. *See Dominske*, 928 F.2d at 638. Relyant was paying Anderson to help pursue contracts with Fluor. *See* Dkt. 229-28, 2–3 (April 1, 2016) ("Objectives . . . Drive [Business Development for Relyant] from inside [of Fluor] . . . vs. beg from outside"); Dkt. 230-20, at 4 (Relyant Board Meeting Agenda) ("2017 BD Focus[:] Fluor Afghan HCN Labor . . . Fluor Opportunities[:] Afghan HCN Labor RFP? New FOBs? What else?"). Structurally, Anderson's support of Relyant came at Fluor's expense. This type of relationship is prohibited by the Restatement (Second) of Agency, which Virginia law recognizes. *See Dominske*, 928 F.2d at 636 ("Adverse interest is nevertheless inherent in the rarer situation that is exemplified by . . . a buyer-seller relationship between

---

[14] The Court finds no genuine issue of material fact over whether Anderson used his position at Fluor to obtain personal benefits in connection with his marketing agreement with LEEP. The uncontroverted evidence indicates that Anderson never obtained a benefit from this agreement.

[15] This would be true even if Fluor did not "acquire[] useful information for the HCN solicitation and share[] it with Relyant." Dkt. 253-2, at 3.

principal and agent. In such a relationship, an irreconcilable tension exists between the interest

the buyer and seller each have in obtaining the maximum financial advantage for himself in

dealing with the other, and the agent's duty to act solely to the principal's advantage in

preference to his own.") (citing Restatement (Second) of Agency § 389 & cmt. a (1958))

(applying South Carolina law); *see also Hilb, Rogal & Hamilton Co. of Richmond v. DePew*, 440

S.E.2d 918, 923 (Va. 1994) (relying on the Restatement (Second) of Agency when evaluating a

breach of fiduciary duty claim under Virginia law).

When a faithless fiduciary assumes an "adverse interest" to a principal, Virginia law

demands that the fiduciary "account to [the principal] the profits derived therefrom."

*Greenspan*, 351 S.E.2d at 37 (citing *Horne*, 188 S.E. at 172). In this case, "profits derived

therefrom" constitute the consulting fees Anderson obtained from Relyant while employed by

Fluor.

The Court therefore denies Anderson's motion for summary judgment on Count VI to the

extent Fluor premises this claim on Anderson's consulting arrangement with Relyant.

### v. Count VII (Virginia Uniform Trade Secrets Act)

VUTSA's plain language "reflects the General Assembly's decision to protect the owner

of a trade secret from another's misuse of that secret." *MicroStrategy Inc. v. Li*, 601 S.E.2d 580,

588 (2004). To successfully recover damages under VUTSA, a Plaintiff must satisfy two

elements: (1) the existence of a trade secret and (2) the Defendant's "misappropriation" of the

trade secret from Plaintiff. *See id.* (citing Va. Code § 59.1-336).

As detailed above, VUTSA defines a "trade secret" as:

> Information, including but not limited to, a formula, pattern, compilation, program,
> device, method, technique, or process, that (1) derives independent economic value,
> actual or potential, from not being generally known to, and not being readily
> ascertainable by proper means by, other persons who can obtain economic value from its
> disclosure or use, and (2) is the subject of efforts that are reasonable under the

33

circumstances to maintain its secrecy.

Va. Code § 59.1-336. "Misappropriation" can occur by two methods:

1. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

2. Disclosure or use of a trade secret of another without express or implied consent by a person who

a. Used improper means to acquire knowledge of the trade secret; or

b. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

(1) Derived from or through a person who had utilized improper means to acquire it;

(2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

(3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(4) Acquired by accident or mistake.

*Id.*

The Court has already determined that the JSI, APS, and Ecolog pricing information qualifies as a trade secret under Va. Code § 59.1-336. Thus, the viability of Fluor's VUTSA claim turns on (1) whether Fluor can "own" a trade secret by merely possessing it, and (2) whether the collateral source rule applies to VUTSA damages under Va. Code § 59.1-338.

On the first issue, the Court answers in the affirmative. Anderson points to *MicroStrategy Inc. v. Li* for the proposition that a Plaintiff must "develop" a trade secret to own it under VUTSA. *See* Dkt. 459, at 29 (citing 601 S.E.2d 580, 588 (Va. 2004)). But Anderson's interpretation is far too narrow to reasonably accommodate the text and purpose of VUTSA. It would preclude a Plaintiff from bringing an action under the Act based on a Defendant's theft of intellectual property that was lawfully purchased by Plaintiff from a third-party.

Instead, the Court finds that a Plaintiff can "own" a trade secret under the meaning of VUTSA by lawfully possessing it. Though federal courts may not create or expand state public

34

policy while "trying to determine how the highest state court would interpret the law," *Talkington v. Atria Reclamelucifers Fabrieken BV*, 152 F.3d 254, 260 (4th Cir. 1998), they may look to how "other federal courts have interpreted nearly identical versions of the uniform law in other states" in search of a correct state law interpretation. *See Smithfield Ham*, 905 F. Supp. at 348 (interpreting Virginia law) (citing *Coulter Corp. v. Leinert*, 869 F. Supp. 732 (E.D. Mo. 1994)). Other courts that have examined this issue have recognized that a Plaintiff's lawful possession of a trade secret can give rise to a Uniform Trade Secret Act ("UTSA") claim. *See, e.g., DTM Research L.L.C. v. AT&T Corp.*, 245 F.3d 327, 332 (4th Cir. 2001); *Advanced Fluid Sys., Inc. v. Huber*, 958 F.3d 168, 177-78 (3d Cir. 2020); *Gaedeke Holdings VII LTD v. Baker*, 683 F. App'x 677, 683 (10th Cir. 2017).

Though Fluor's lawful possession of the JSI, APS, and Ecolog pricing information can give rise to a VUTSA claim, Fluor fails to identify any authority supporting its core damages theory: that the collateral source rule should apply under Va. Code § 59.1-338. Though UTSA codified certain elements of the common law tort of trade secret misappropriation, *see* Unif. Trade Secrets Act, Prefatory Note (amended 1985), it introduced a novel damages framework. *See* Unif. Trade Secrets Act, § 3. VUTSA's express guidance that "[d]amages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation" suggests that recovery under the Act is designed to provide the Plaintiff with adequate compensation for Defendant's complete misappropriation, but no more. This position is buttressed by commentary accompanying UTSA's damages provision, which cites approvingly to judicial decisions that prohibit "double counting" of actual losses and unjust enrichment. *See* Unif. Trade Secrets Act, § 3, cmt ("As long as there is no double counting, Section 3(a) adopts the principle of the recent cases allowing recovery of both a complainant's

35

actual losses and a misappropriator's unjust benefit that are caused by misappropriation.") (citing *Tri-Tron Int'l v. Velto*, 525 F.2d 432 (9th Cir. 1975)); *see also id.* ("[T]he Act adopts an express prohibition upon the counting of the same item as both a loss to a complainant and an unjust benefit to a misappropriator").[16]

Accordingly, the Court grants summary judgment to Anderson on Count VII.

\* \* \*

In sum, the Court grants summary judgment on Counts III, IV, V, VII, VIII, and IX, and grants partial summary judgment is granted as to Counts I and II. The Court denies summary judgment as to Count VI.

## B. Fluor's motion for summary judgment

Fluor motions for summary judgment on all of Anderson's claims. Specifically, Fluor challenges Count I (Defamation), Counts II and III (Stored Communications Act and Computer Fraud and Abuse Act Violations), Count IV (Breach of Contract), Count V (Implied Covenant of Good Faith and Fair Dealing), Counts VI and VII (Negligence and Gross Negligence), and Count VIII (Va. Code. § 8.01-40 Violation).

### i.  Count I (Defamation)

The Court previously denied Fluor the opportunity to amend its answer to add absolute immunity as an affirmative defense to Anderson's defamation claim. *See* Dkt. 197, at 5 n.4.

---

[16] Not extending the collateral source rule to VUTSA damages also harmonizes with the Virginia Supreme Court's position on the rule's application to breach of contract claims. *See Dominion Resources*, 825 S.E.2d at 272 ("When a party has paid valuable consideration before the breach to a collateral source to insure against a loss or otherwise to protect its interest, there is no logical reason to deny that party a benefit it has paid for and grant it to another party who neither negotiated for it, paid for it, nor absorbed the opportunity costs for securing it, but who has participated the loss."). VUTSA makes clear that the Act "does not affect . . . [c]ontractual remedies whether or not based upon misappropriation of a trade secret." Va. Code § 59.1-341(B)(1). VUTSA's statutory framework therefore accommodates collateral source damages, but only to the extent that they have been "bargained for." Had Fluor paid valuable consideration for collateral source protection against Anderson's misappropriation of Fluor's trade secrets, VUTSA's amendment to UTSA would allow for damages above and beyond the Government's reimbursement. But no agreement was struck, and so VUTSA's limited "double recovery" carve-out counsels against awarding Fluor damages beyond its reimbursement.

36

Though the Court's prior ruling operates as law of the case, this doctrine is "neither absolute nor inflexible; it is a rule of discretion rather than a jurisdictional requirement." *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 807–08 (E.D. Va. 2007); *see Smith v. Bounds*, 813 F.2d 1299, 1304 (4th Cir. 1987). The Court has the authority to revisit and depart from its prior decisions when justice so requires. *See Christianson v. Colt Indus. Op. Corp.*, 486 U.S. 800, 817 (1988) (quoting *Arizona v. California*, 360 U.S. 605, 618 (1983)). Revisitation is appropriate here.

Manifest injustice will result if Fluor's arguments on this issue are barred, as denial will deprive Fluor of an absolute defense that will not result in unfair surprise or prejudice to Anderson. *See Grunley Walsh U.S., LLC v. Raap*, 386 F. App'x 455, 459 (4th Cir. 2010) (citing *Patten Grading & Paving, Inc. v. Skanska USA Bldg., Inc.*, 380 F.3d 200, 205 n.3 (4th Cir. 2004)). Anderson has had ample occasion to respond to Fluor's legal position. *See* Dkt. 248, at 31–38. Moreover, to the extent that the applicability of Fluor's absolute immunity defense turns on factual issues, Anderson has had incentive and opportunity to probe these issues through discovery.[17] Relaxation of the Court's pretrial order is therefore warranted. *See Barwick v. Celotex Corp.*, 736 F.2d 946, 954 (4th Cir. 1984).

* * *

The Court grants Fluor summary judgment on Count I of Anderson's complaint because Fluor is entitled to absolute immunity.

Anderson was employed by Fluor to perform work on Fluor's Logistics Civil Augmentation Program IV contract ("LOGCAP IV") for the Department of Defense ("DOD"). LOGCAP IV incorporates by reference 48 C.F.R. § 52.203-13, a regulatory mechanism known

---

[17] As discussed below, the only factual issue that is relevant to the applicability of Fluor's absolute immunity to defamation concerns whether Fluor had "credible evidence" that Anderson violated federal criminal law. *See* 48 U.S.C. § 52.203-13(b)(3)(i). Anderson fully explored this issue during discovery based on its relevance to his negligence claim, along with his defenses to Fluor's fraud claims.

as the Contractor Code of Business Ethics and Conduct. *See* Dkt. 231-41, at 4 (amending Fluor's W52P1J-07-D-0008 contract to add an updated "Contractor Code of Business Ethics and Conduct" provision); *see also* Dkt. 231-18, at 4–9; Dkt. 231-30, at 2; Dkt. 231-31, at 3.

48 C.F.R. § 52.203-13 "requires government contractors to have a written code of business ethics and conduct, exercise due diligence to prevent and detect criminal conduct, and establish an ongoing business ethics awareness and compliance program as well as an internal control system." *In re Fluor Intercontinental, Inc.*, 803 F. App'x 697, 698 n.1 (4th Cir. 2020) (citing 48 C.F.R. § 52.203-13(b)-(c)). Moreover, 48 C.F.R. § 52.203-13 requires contractors to "timely disclose, in writing, to the agency Office of Inspector General (OIG), with a copy to the Contracting Officer, whenever . . . the Contractor has credible evidence that a principal, employee, agent, or subcontractor has committed" a violation of federal criminal laws involving, *inter alia*, a "conflict of interest." *See* Dkt. 231-18, at 5 (citing 48 C.F.R. § 52.203-13(b)). The disclosure requirement set forth in 48 C.F.R. § 52.203-13 is mandatory. 48 C.F.R. § 52.203-13(b)(3)(i) ("The Contractor *shall* timely disclose . . . .") (emphasis added). In fulfilling this legal obligation, contractors are not required to "carry out a complex investigation, but only [need] to take reasonable steps that the contractor considers sufficient to determine that the evidence is credible." 73 Fed. Reg. 67,064-02, 67,075 (Nov. 12, 2008).

Against this backdrop, legal and public policy principles support extending absolute immunity to Fluor.

To start, *Becker v. Philco Corporation* makes clear that the "unqualified privilege" of immunity from defamation suits that is afforded to government officials in investigatory contexts can also reach government contractors. *See* 372 F.2d 771, 774 (4th Cir. 1967); *see also* *Mangold*, 77 F.3d 1442, 1447 (4th Cir. 1996). *Becker* teaches that "an action for [defamation]

38

will not lie in the circumstances against a private party fulfilling its governmentally imposed duty to inform." 372 F.3d at 776. Thus, a contractor's mandatory disclosure made pursuant to a governmental regulatory scheme is entitled to absolute immunity against defamation. *See id.* at 774–76.

Anderson fixates on *Becker*'s use of "mandatory" in such a way that would render any disclosure of suspected wrongdoing to a government agency non-mandatory so long as it involves a modicum of judgment on the part of the discloser. *See* Dkt. 248, at 35. He insists that because Fluor had to evaluate whether "credible evidence" of his wrongful conduct existed prior to sending its "Notification of Potential Violation" to the DOD-IG pursuant to 48 C.F.R. § 52.203-13(b)(3)(i), Dkt. 231-30, Fluor "was not 'fulfilling [a] governmentally imposed duty to inform'" like the Defendant in *Becker*. *Id.* at 35 (citing *Becker*, 372 F.3d at 776).

The Court disagrees. Under federal acquisition regulations, Fluor was obligated to institute an internal control system and exercise due diligence to detect wrongful conduct in connection with its federal contracting work. *See* 48 C.F.R. § 52.203-13(b)-(c). When Anderson's apparent wrongful conduct was identified through Fluor's internal control system, *see* Dkt. 231-17; 48 C.F.R. § 52.203-13(c)(2)(D), Fluor conducted an obligatory "preliminary examination of the evidence." *See* 73 Fed. Reg. at 67,074. It undertook "reasonable steps" to ascertain the existence of credible evidence of Anderson's potential violations of federal criminal law. *See id.* These steps included an extensive review of Anderson's company email account, interviews of numerous witnesses, analysis of third-party marketing materials, conversations with entities affiliated with Anderson, inspections of public-source financial information, and a careful inspection of internal compliance and training documents. *See* Dkt. 229, at 29–32; Dkt. 231-18, at 12 (overviewing Fluor's investigation into Anderson); Dkt. 231-24 (listing Fluor's

investigative steps and sources of information); *see also* 231-30 (summarizing the findings of

Fluor's investigation into Anderson).

Upon completion of these "reasonable steps," Fluor determined that "credible evidence"

of Anderson's wrongful conduct did, in fact, exist. *See, e.g.*, Dkt. 229-10, at 22; Dkt. 229-16, at

8. Thus, it was obligated to make a timely disclosure of its findings to the DOD-IG pursuant to

48 C.F.R. § 52.203-13(b)(3)(i). While an element of subjective judgment shepherded Fluor's

progression through FAR § 52.203-13's mandatory process,[18] at no point was Fluor able to cease

and desist; its "duty to inform," *Becker*, 372 F.2d at 776, persisted in full force until Fluor's

Chief Compliance Officer, David Methot, sent Fluor's "Notification of Potential Violation" to

the DOD-IG on March 19, 2018. *See* Dkt. 231-30.

Resisting this outcome, Anderson questions Fluor's absolute immunity by arguing that

portions of Fluor's disclosure were, in fact, false. *See* Dkt. 248, at 37 ("[T]here are genuine issues

regarding whether some of Fluor's statements to the DOD were false[.]"). The Court does not

disagree with Anderson's position that the scope of absolute immunity afforded to contractors

under 48 C.F.R. § 52.203-13 is not unlimited. *See* Dkt. 248, at 37–38. "Credible evidence" that

a principal, employee, agent, or subcontractor of the Contractor has violated criminal law is a

*sine qua non* of a contractor's absolute immunity under 48 C.F.R. § 52.203-13(b)(3)(i).[19] As a

result, Fluor would not be entitled to absolute immunity for a malicious disclosure comprised

---

[18] Anderson suggests that Fluor "admits in its briefing that its Disclosure was 'discretionary.'" Dkt. 248, at 35 (citing Dkt. 229, at 40). This statement mischaracterizes Fluor's position. As Fluor's opposition explains, "Fluor does not concede its disclosure was in fact voluntary. Fluor has continually maintained its disclosure was mandatory under the FAR and has cited uncontradicted evidence in the record to that effect." *See* Dkt. 229, at 39 n.11. To the extent Fluor discusses the voluntariness of its disclosure to the DOD-IG, it likely does so to hedge against the uncertainty of the Court's prior ruling disallowing its amendment of its answer to incorporate the affirmative defense of absolute immunity. *See* Dkt. 229, at 39–40.

[19] Preconditions to absolute immunity are well established. Absolute judicial immunity, for instance, insulates jurists from suit only if challenged conduct qualifies as a "judicial act." *See Pierson v. Ray*, 386 U.S. 547, 554–55 (1967) ("The immunity of judges for acts *within the judicial role* is equally well established, and we presume that Congress would have specifically so provided had it wished to abolish the doctrine.") (emphasis added).

entirely of knowingly false information. *Cf.* Dkt. 229, at 41 (citing *Day v. Johns Hopkins Health Sys. Corp.*, 907 F.3d 766, 772 (4th Cir. 2018)).

But Anderson overreaches by insisting that 48 C.F.R. § 52.203-13 "expressly disavows 'absolute immunity' for false statements in a government disclosure." Dkt. 248, at 35. Even though Defense Department administrative guidance suggests that contractors can be sued "for damages associated with erroneously disclosing alleged violations" pursuant to the FAR, 73 Fed. Reg. at 67,084, this administrative guidance also makes clear that "credible evidence" of a violation, which mandates a contractor's disclosure, can exist absent an actual violation. *See id.* at 67,073–74 (contemplating the mandatory disclosure of "a *potential* cause for suspension/ debarment") (emphasis added). Defense Department's guidance also indicates that contractors advocated for the "credible evidence" standard to reduce compliance costs and to avoid over-reporting. *See id.* at 67,073. That explains why only reasonable investigative steps are "sufficient to determine that . . . evidence is credible." *See id.* at 67,074.

Thus, Anderson's assertion that the FAR's mandatory disclosure rule demands absolute truth is incompatible with 48 C.F.R. § 52.203-13's function. The DoD would not suggest that less than a "complex investigation" can supply a contractor with "credible evidence," only to have any germ of falsehood in a mandatory disclosure result in civil liability. *See* 73 Fed. Reg. at 67, 074.

Against this regulatory backdrop, Anderson fails to raise a genuine dispute of material fact that would defeat a legal determination that Fluor had credible evidence that he violated a federal criminal law before Fluor sent its "Notification of Potential Violation" letter to the DOD-IG. *See* Dkt. 231-30.

In Fluor's letter to the DOD-IG, it contends that "Anderson had a financial interest in and

41

appears to have inappropriately assisted a Fluor supplier and potential subcontractor, Relyant Global LLC (Relyant), while serving as [Fluor's] project manager" on Defense Department projects in Afghanistan. *Id.* at 3, 5. In support of this contention, Fluor states that "Anderson attended VHG and Relyant board meetings and conference calls . . . at which Fluor Opportunities [were] listed as an agenda item," *id.* at 7, and details Anderson's 6.5% stake in VHG, *id.* Anderson does not materially dispute Fluor's allegations. *See* Dkt. 225-1, at 8 (Anderson acknowledging his 6.5% stake in VHG); *id.* at 9 (Anderson discussing his attendance at board meetings at which Fluor opportunities were discussed); *see also id.* at 10 (Anderson explaining his promotion of Relyant's concrete business to the German military as a matter of course). And information gleaned by Fluor from its investigation after receiving Tod Nickles's letter of concern on October 19, 2017, *see* Dkt. 231-17, but before sending its "Notification of Potential Violation" letter to the DOD-IG on March 19, 2018, Dkt. 231-30, lends credibility to Fluor's assertions. *See, e.g.*, Dkt. 231-24, at 4 (Anderson explaining to Fluor investigators that "he felt if he was able to help VHG increase it's [sic] worth he would be able to recover the loss he sustained on [VHG's] energy company."); *id.* ("In response to questions in reference to his disclosure of VHG and Relyant Global, Anderson acquiesced to the fact [that] August 8, 2017 . . . . was the first time he disclosed his 6.5% ownership in VHG, and the fact VHG owned Relyant Global"); Dkt. 230-23, at 3 ("Regret [sic] that Fluor does not have a concrete batch plant, but not to worry – we buy our high-quality concrete from our subcontractor, Relyant Global, and they have a batch plant here at Bagram Airfield. I am not well versed on their pricing, but be advised Relyant Global is a very reputable company that produces the best quality concrete in Afghanistan"); Dkt. 231-29, at 3–4 (Anderson receiving an agenda for a Relyant Board Meeting that lists "Fluor opportunities" and "Fluor Afghan HCN Labor" as a "BD focus").

In its "Notification of Potential Violation" letter to the DOD-IG, Fluor also contends that "Anderson used his position . . . to obtain and improperly disclose nonpublic information to Relyant about Fluor's subcontract competition for Host Country National support." Dkt. 231-30, at 2, 5. Again, Anderson does not materially dispute this contention. *See* Dkt. 225-7, at 23–24; *see also* Dkt. 225-1, at 10 (failing to recollect). And again, Fluor obtained information from its investigation before contacting the DOD-IG that lends credibility this assertion. *See* Dkt. 231-27 (Anderson providing Don Patton of Relyant with information about the timing of Fluor's HCN subcontract competition, along with the number and names of bidders submitting proposals); *see id.* ("Subcontracts in Greenville still hasn't had their selection board, but my subcontracts manager mentioned 'Relyant is clearly in the thick of it with a very competitive bid' when I asked who the top submissions were from. That's all I could get him to disclose. If the winner is someone other than incumbent APS, they will issue a 3 month extension to 1 Oct 17 to APS to continue thru transition period, then handoff on 1 Oct."); *see also* Dkt. 231-29, at 4.

This information, effectively undisputed by Anderson and substantiated by Fluor, qualifies as "credible evidence" of potential criminal conduct. Fluor's mandatory disclosure obligations under 48 C.F.R. § 52.203-13(b) were thereby triggered. *See, e.g.*, 41 U.S.C. §§ 2105, 8701–07; 18 U.S.C. §§ 287, 666, 1001, 1031, 1343, 1346. Accordingly Fluor is entitled to absolute immunity for its statements made in the March 19, 2018 "Notification of Potential Violation" letter to the DOD-IG.

Anderson further asserts that absolute immunity should not extend to Fluor because the case at bar is factually distinct from other Fourth Circuit cases in which Courts have found government contractors absolutely immune to defamation claims. *See* Dkt. 248, at 35–36 (citing *Mangold*, 77 F.3d at 1447); *see also Liverett v. DynCorp Int'l LLC*, 2018 WL 1533013 (E.D. Va.

43

Mar. 28, 2018).[20]

Anderson may be correct to note that the specific "legal regime" applicable in this case is one of first impression in the Circuit. Dkt. 248, at 30. But he fails to explain why that matters. The distinct cases to which he points are not factually identical with one another. Yet, each is governed by the same overriding public policy consideration: contractors that cooperate in government investigations into contracting corruption must not be "left exposed to lawsuits filed by those under investigation," or else "they might be reluctant to cooperate, even if they were eyewitnesses to improper conduct." *Mangold*, 77 F.3d at 1447. *Mangold* additionally cautions that "in the absence of such protection, [contractors] might distort information in an effort to avoid exposure to tort liability." *Id.* Other Courts have embraced this reasoning. *See, e.g.*, *Gulati v. Zuckerman*, 723 F. Supp. 353, 358 (E.D. Pa. 1989); *Sember v. Booz Allen Hamilton Eng'g Servs., LLC*, 2017 WL 3314652, at *4 (S.D. Ohio Aug. 3, 2017); *Montgomery v. Sanders*, 2008 WL 4546262, at *3-4 (S.D. Ohio Aug. 18, 2008); *see also Murray v. Northrop Grumman Info. Tech., Inc.*, 444 F.3d 169, 174 (2d Cir. 2006); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 73 (2d Cir. 1988).

The Court finds that exposing Fluor to tort liability based on its "Notification of Potential Violation" to the DOD-IG pursuant to 48 C.F.R. § 52.203-13(b), Dkt. 231-30, would undermine processes designed to curb contracting corruption that "aid in the effective functioning of government." *Becker*, 372 F.2d at 774. Accordingly, and for the reasons stated above, the Court

---

[20] The Court regrettably notes Flour's counsel's misleading citation to *Liverett*. *Compare* Dkt. 229, at 37 ("[T]he Fourth Circuit has made clear that government contractors are immune from defamation actions . . . where the allegedly defamatory statements are made by a 'private party fulfilling its governmentally imposed duty to inform.'") (citing *Liverett*, 2018 WL 1533013, at *5), *with Liverett*, 2018 WL 1533013, at *5 ("[T]he Fourth Circuit has made clear that government contractors are immune from defamation actions *(i)* where the allegedly defamatory statements are made by a "private party fulfilling its governmentally imposed duty to inform, *and (ii) where the allegedly defamatory statements are given by a government contractor and its employees in response to queries by government investigators engaged in an official investigation*.") (emphasis added) (citations and internal quotation marks omitted). This deceptive excising of language is unprofessional.

44

finds that Fluor wields absolute immunity to Count I, and is therefore entitled to summary judgment.

### ii. Counts II and III (Stored Communications Act and Computer Fraud and Abuse Act)

Fluor is also entitled to summary judgment on Counts II and III of Anderson's complaint because there is no genuine dispute of material fact as to whether Fluor accessed Anderson's personal email accounts.

Civil liability under the Stored Communications Act ("SCA") exists when a Defendant intentionally and without authorization accesses a facility through which an electronic communication service is provided, or exceeds authorization to access such a facility. *See* 18 U.S.C. § 2701. Anderson alleges that Fluor violated the SCA by accessing his "private email accounts through his personal computer in his private quarters in Afghanistan without [his] knowledge or consent" by accessing a "facility through which an electronic communication service was provided." Dkt. 29, at 21, ¶¶ 55–57.

Civil liability under the Computer Fraud and Abuse Act ("CFAA") exists when a Defendant [1] intentionally accesses a protected computer without authorization and, as a result of such conduct, causes damage and loss; [2] intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer; or [3] knowingly causes the transmission of a program, information, code, or command and, as a result of such conduct, intentionally causes damage without authorization to a protected computer. *See* 18 U.S.C. § 1030. Anderson similarly alleges that Fluor violated the CFAA by accessing his private email accounts without authorization in such a way that affected interstate commerce and caused him loss. Dkt. 29, at 21–22, ¶¶ 58–60.

At bottom, Anderson has nothing but a "hunch" to factually support Counts II and III.

45

*See* Dkt. 229-6, at 66–67 ("I have nothing of evidence . . . I came away with the understanding that they hacked into my email . . . I had a hunch."). He insists that "Fluor produced emails in discovery that it could not have collected without accessing BG Anderson's personal email accounts or personal devices." Dkt. 248, at 41. For evidence, he directs the Court to two of his "private" emails in Fluor's possession that he believes substantiate his claim. *See* Dkt. 248-4, at 29–32. But Fluor demonstrates that neither of these emails were accessed surreptitiously or without authorization. *See* Dkt. 250, at 28. One of the emails was produced to Fluor by Relyant pursuant to subpoena. *Id.* The other was attached to an email Anderson sent to his Fluor email address. *Id.*

There is not even a scintilla of evidence supporting Counts II and III. *See, e.g.*, Dkt. 231-9, at 3 (Declaration of Ken McConnell, Fluor's Director of Information Security) ("At no time did I access any personal email account or personal device owned by Anderson, nor am I aware of anyone from Fluor (other than Anderson) doing so."); Dkt. 231-10, at 3 (Declaration of Erica Hawthorne, Fluor's Manager of E-Discovery and Litigation Support) ("At no time did I access any personal email account or personal device owned by Anderson, nor am I aware of anyone from Fluor (other than Anderson) doing so."); *see also* Dkt. 229-15, at 2 (Fluor's Information Systems Code of Conduct). The Court will not saddle Fluor with the burden of defending these claims. *See Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1198 (11th Cir. 1997) ("Summary judgment cannot be avoided . . . based on hunches unsupported with significant probative evidence."); *see also Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 134-35 (4th Cir. 2002) ("[S]ubjective beliefs, . . . without more, [are] insufficient to create a genuine issue of material fact"). Thus, Fluor is entitled to summary judgment on Counts II and III.

### iii.  Count IV (Breach of Contract)

The Court also grants Fluor summary judgment on Anderson's Breach of Contract claim.

46

As detailed above, a breach of contract action in Virginia requires (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation. *Filak*, 594 S.E.2d at 614.

Here, Anderson cannot demonstrate the existence of a legally enforceable obligation breached by Fluor. Anderson suggests that Fluor's offer of employment was for a term lasting through May 2019. Dkt. 29, at 22, ¶ 62. But the record does not raise a genuine issue of material fact as to this matter. Documentary evidence demonstrates unequivocally that the employment relationship between Anderson and Fluor was "at-will" at all operative times, such that either party could have terminated it without prior notice or cause.

There were pre-employment negotiations between Anderson and Fluor personnel that culminated in a "gentleman's agreement" that Anderson would remain with Fluor for two years. *See* Dkt. 229-10, at 8.

However, Anderson thereafter assented to his written employment agreement with Fluor. *See* Dkt. 229-5, at 6; Dkt. 229-6, at 25. This employment agreement made clear that Anderson was an at-will employee. Dkt. 229-5, at 6. In fact, the agreement expressly conditioned Anderson's employment on his at-will status:

> As with most companies, the employment relationship with Fluor is based on the mutual consent of you and the Company. Your employment with Fluor is not for any specified period of time and can be terminated by either you or the Company at any time with or without any cause or advance notice. Nothing contained in this offer letter is intended, nor should it be construed, to alter the at-will relationship Fluor and its employees maintain with one another. Although [Fluor] reserves the right to change from time-to-time other terms, conditions, and benefits of employment (including but not limited to your job title, job duties and compensation), the at-will nature of employment with [Fluor] is one aspect of our employment relationship that will not change. The only way the at-will nature of our employment relationship can be changed is by way of an express written agreement, signed by you and the Senior Vice President, Human Resources and Administration.

47

*Id.* at 6. Nowhere in Anderson's filings does he cite any "express written agreement, signed by . . . the Senior Vice President, Human Resources and Administration" that modified these terms. *See* Dkt. 248, at 41–45.

Anderson's employment agreement with Fluor also contained a merger clause that conditioned Anderson's employment on his disavowal of any pre-employment promises or representations made to him inconsistent with the agreement's express terms:

> [B]y accepting this offer, you represent that *you are aware of no obligations legal or otherwise, inconsistent with the terms of this offer letter or with your undertaking employment with Fluor.* Further, by signing this offer letter, you also acknowledge that no other promises or representations have been made to you other than those contained in this offer letter.

Dkt. 229-5, at 6 (emphasis added). This provision renders Anderson's prior negotiations with Fluor parol evidence that is inadmissible "to vary, contradict, add to, or explain" the terms of the parties' employment agreement. *See Shevel's, Inc.-Chesterfield v. Se. Ass'n*, 320 S.E.2d 339, 343 (Va. 1984).

Anderson also cannot argue that there was no meeting of the minds when he signed the employment agreement. In his deposition, he begrudgingly admits that he understood the terms of his employment contract when he ratified it, and he that he comprehends the nature of at-will employment. *See* Dkt. 229-6, at 25–27.

With little room to maneuver, he argues that Fluor's offer of "increased compensation and retention bonuses" after he began his employment converted him into a contract employee. *See* Dkt. 248, at 43–44 (citing *Dulany Foods, Inc. v. Ayers*, 260 S.E.2d 196, 200–02 (Va. 1979); *Twohy v. Harris*, 72 S.E.2d 329, 332–33 (Va. 1952)). He cites his boss's efforts to bonus him and increase his pay to incentivize the longevity of his employment in support of this proposition. *See* Dkt. 248, at 43.

This argument fails because Anderson's employment contract expressly contemplated retention bonuses and increased compensation, and made clear that these incentives would not alter his at-will status absent a written agreement between the parties. *See* Dkt. 229-5, at 4–5 ("You will receive a retention award of $50,000 USD. . . . If in the event your employment terminates prior to the conclusion of the retention period for any reason . . . including termination for cause . . . the retention award will be forfeited in its entirety."); *id.* at 6 ("Although the Company reserves the right to change from time-to-time other terms, conditions, and benefits of employment (including . . . compensation), the at-will nature of employment with the Company is one aspect of our employment relationship that will not change."). Nor did Anderson undertake any new duties in response to his bonuses and increased compensation that would give rise to a distinct contractual relationship. *See Selman v. Am. Sports Underwriters, Inc.*, 697 F. Supp. 225, 240–01 (W.D. Va. 1988) (quoting *Sea-Land Serv., Inc. v. O'Neal*, 297 S.E.2d 647, 650 (Va. 1982)).

Anderson's breach of contract claim is wholly without merit under traditional rules of contract interpretation. Because these precepts apply in the employment context in Virginia, *Handley v. Boy Scouts of Am.*, 1992 WL 12024801, at *6 (Va. Cir. Ct. 1992), Fluor is entitled to summary judgment.

### iv.  Count V (Breach of Implied Covenant of Good Faith and Fair Dealing)

Anderson alleges that Fluor breached its implied covenant of good faith and fair dealing by terminating him to "avoid having to pay him the retention bonus to which he would shortly be entitled," and to "protect Fluor's competitive position with regard to the to-be-awarded LOGCAP V contract." Dkt. 29, at 23, ¶¶ 71–72.

As already explained, Anderson's employment with Fluor was at-will. Virginia law "does not recognize a cause of action for breach of an implied covenant of good faith and fair

dealing in employment contracts, and in at-will employment contracts in particular." *Devnew v. Brown & Brown, Inc.*, 396 F. Supp. 2d 665, 671 (E.D. Va. 2005); *id.* ("While the Court is sympathetic to [the employee's] position, [the Court] is simply not empowered to broaden the scope of an implied covenant of good faith and fair dealing from the commercial context to the employment context."); *see also Chapman v. Asbury Auto. Grp., Inc.*, 2017 WL 3324486, at *5 (E.D. Va. Aug. 3, 2017); *Nisbett v. Reconart, Inc.*, 2017 WL 1745045, at *5 (E.D. Va. May 3, 2017); *Harmon v. Dyncorp Int'l, Inc.*, 2015 WL 518594, at * 13–14 (E.D. Va. Feb. 6, 2015), *aff'd* 624 Fed. App'x 104 (4th Cir. 2015). Anderson all but concedes this legal position. *See* Dkt. 248, at 45 ("[T]his type of claim may not be viable in the at-will employment context[.]"). Thus, Fluor is entitled to summary judgment on Count V.

### v. Counts VI and VII (Negligence and Gross Negligence)

To succeed on Counts VI and VII, Anderson must demonstrate the existence of a legal duty owed by the Defendant, a breach of that duty, and damage caused by Defendant's breach. *Terry v. Irish Fleet, Inc.*, 818 S.E.2d 788, 792 (Va. 2018). "[W]hether a legal duty in tort exists is a pure question of law." *Kellermann v. McDonough*, 684 S.E.2d 786, 790 (Va. 2009).

Anderson alleges that Fluor owed him three legal duties: (1) the duty to "promptly, fully, and accurately provide the appropriate resources necessary to document [his] disclosed interests in other businesses," (2) the duty to "conduct a fair and impartial investigation into [his] alleged conflict of interest," and (3) the duty to "report accurately researched and truthful information" about him to the DOD-IG. Dkt. 248, at 47. The Court finds scant legal authority to support the existence of the first two proposed duties, and it finds that Anderson's third proposed duty (if it exists) would give rise to a claim that simply duplicates his defamation claim. In any case, Anderson suffered no injury stemming from Fluor's purported breach, and so Fluor is entitled to summary judgment on Counts VI and VII.

50

Neither party marshals any authority demonstrating the existence of Anderson's first two proposed duties under Virginia tort law,[21] which are extraordinarily narrow.[22] Thus, the Court will not fashion these duties out of whole cloth. *See Nisbett*, 2017 WL 1745045, at *5 (refusing to recognize a new tort duty where "neither party [could] cite to a single case" demonstrating its existence); *cf. Sellers v. Sch. Bd. of the City of Manassas*, 960 F. Supp. 1006, 1012 (E.D. Va. 1997) ("[T]he Supreme Court of Virginia has never recognized [the tort of educational malpractice] and it would be inappropriate for this Court to do so in the first instance, for this Court must await the decision of the Virginia General Assembly and the Virginia Supreme Court before it may recognize a new cause of action.") (quotation marks omitted); *Gravins v. International Playtex, Inc.*, 586 F. Supp. 251, 252 (E.D. Va. 1984) ("As long as representative government exists, there is no excuse for a court arrogating to itself the authority to move the law along some purportedly wise or socially desirable path.").

Perhaps recognizing this issue, Anderson recasts his first two proposed duties as a broadened, consolidated, and freestanding duty on the part of Fluor to "investigat[e] and document[] [his] potential conflicts of interest" in his opposition. *See* Dkt. 248, at 47. The cases he cites for this proposition are highly inapposite. *Compare* Dkt. 248, at 46–47, *with* Dkt. 250, at 31. However, the Court has identified at least one authority recognizing this duty. *See Criterion 508 Sols., Inc. v. Lockheed Martin Servs., Inc.*, 806 F. Supp. 2d 1078, 1100–02 (S.D. Iowa 2009) (recognizing an employer's "duty to investigate . . . employment history and any potential

---

[21] The parties generally agree that Virginia courts do not recognize a cause of action for "negligent discharge" in the "context of an at-will employee's termination." *See* Dkt. 229, at 51–52. Anderson also does not challenge Fluor's position that Virginia courts do not recognize an action for "negligent investigation." *Compare* Dkt. 229, at 51–52 (citing *Davis v. UPS*, 1997 WL 702278, at *2 (4th Cir. 1997)), *with* Dkt. 248, at 46-47.

[22] Anderson's first proposed duty would obligate employers to promptly provide resources to document all interests in other businesses. Dkt. 29, at 24, ¶ 75. His second proposed duty would obligate employers to investigate conflicts of interest in a manner that is "fair and impartial." *Id.* ¶ 76. To the Court's knowledge, these duties have never been recognized in a Virginia negligence action founded on an employment relationship.

51

conflict of interest limitations"). *Criterion* dealt with an intentional tort under a different state's law, and so it provides only limited support for Anderson's position. *See id.*

But even assuming the existence of the duty Anderson proposes in his opposition, Fluor's breach thereof would not have caused Anderson damages. Anderson was an at-will employee, so Fluor was entitled to terminate him for any reason. *Cty. of Giles v. Wines*, 546 S.E.2d 721, 723 (Va. 2001) (citing *Miller v. SEVAMP, Inc.*, 362 S.E.2d 915, 917 (Va. 1987)). Accordingly, Anderson cannot claim that Fluor's breach "proximately caused grave injury and harm to [him], in that, *inter alia*, Fluor decided to terminate and did terminate [his] employment with Fluor only weeks after giving [him] a significant pay raise and after recognizing [his] exemplary performance as Fluor's Country Manager in Afghanistan[.]" Dkt. 29, at 27, ¶ 91.

That leaves only Anderson's injuries caused by Fluor's "Notification of Potential Violation" letter sent to the DOD-IG, which "caused the Department of Defense to propose [him] for debarment and caused his name to be permanently added to the 'Inactive' List of Individuals Proposed for Debarment." *Id.* As the Court previously explained, these injuries were incurred due to Fluor's mandatory disclosure obligations in accordance with 48 C.F.R. § 52.203-13. Thus, any failure on the part of Fluor to investigate and document Anderson's potential conflicts of interest did not cause him injury.

Anderson's final theory of simple and gross negligence fails for the same reason. Fluor's purported duty to "report accurately researched and truthful information" about him to the DOD-IG is inconsistent with the regulatory scheme imposed on Fluor by 48 C.F.R. § 52.203-13. If recognized, Anderson's third proposed duty would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Moreover, even assuming this species of negligence claim was compatible

with federal acquisition regulations, it would represent an improper attempt to repurpose Anderson's defamation claim. *See, e.g., Castle v. Rite Aid Corp.*, 2015 WL 13801186 (Va. Cir. Ct. 2015) ("The Court is not aware of any case law or other authority for the proposition of trying and sending to a jury a claim of . . . negligence arising out of the same facts that are alleged as the basis for proof of the elements of the specific tort[] of . . . defamation. The damages sought . . . flow from insult, shame, embarrassment, humiliation, indignity to feelings, damage to reputation and loss of community standing . . . ."); *Abadian v. Lee*, 117 F. Supp. 2d 481, 489 (D. Md. 2000) (observing that under Virginia law, a "plaintiff cannot prevail on a negligence claim after she loses a defamation claim based on the same pleadings") (citations omitted); *Jackson v. Michalski*, 2011 WL 3679143, at *16 (W.D. Va. Aug. 22, 2011) ("[I]t is apparent from the briefing that [Plaintiff] is attempting to duplicate his defamation . . . claim[] under the guise of a negligence action."); *see also Boykin Anchor Co. v. AT&T Corp.*, 825 F. Supp. 2d 706, 712 (E.D.N.C. 2011) ("Courts have traditionally been very cognizant of the distinctions between defamation on the one hand and negligence on the other, and have resisted efforts by plaintiffs to recast an action sounding in the former into one sounding in the latter.") (citing *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 695 (9th Cir. 1998)).

For the reasons stated above, the Court grants Fluor summary judgment on Counts VI and VII.

### vi.   Count VIII (Va. Code § 8.01-40)

Finally, the Court grants summary judgment to Fluor on Count VIII.

Virginia Code § 8.01-40 provides that "[a]ny person whose name . . . is used without having first obtained the written consent of such person . . . for advertising purposes or for the purposes of trade" may sue. Va. Code § 8.01-40. Anderson asserts that "[b]y voluntarily disclosing [his] name and false allegations regarding [him] to the Department of Defense's

Office of Inspector General without [his] written consent in order competitively position [sic] Fluor for an award of the LOGCAP V contract in the eyes of the Army Sustainment Command, Fluor used [Anderson's] name[23] . . . for purposes of trade in violation of Virginia Code § 8.01-40." Dkt. 29, at 28, ¶ 94; *see also* Dkt. 248, at 47–48. Even affording Va. Code § 8.01-40's language a liberal construction, *Crump v. Forbes*, 2000 WL 332587652, at *2 (Va. Cir. Ct. 2000), Anderson's proposed interpretation would contravene sacrosanct federalism principles. It also lacks a reasonable limiting principle.

As previously explained, Fluor's "use" of Anderson's name in its "Notification of Potential Violation" submitted to the DOD-IG was mandatory under 48 C.F.R. § 52.203-13. *See* Section IV.B.i. Thus, regardless of whether Fluor hoped to curry favor with Army Sustainment Command by notifying the DOD-IG about Anderson's suspected misdeeds, Dkt. 29, at 28, ¶ 94, Anderson's reading of Va. Code § 8.01-40 would impose an untenable choice on Fluor: violate Virginia law or violate federal acquisition regulations. The Supremacy Clause does not tolerate this choice. *See* U.S. Const. art. VI, cl. 2; *see Coll. Loan Corp. v. SLM Corp.*, 396 F.3d 588, 595 (4th Cir. 2005) ("The Supremacy Clause of the Constitution makes federal law the supreme Law of the Land. . . . As a result, federal statutes and regulations properly enacted and promulgated can nullify conflicting state or local actions.").

Moreover, because Anderson concedes that no "false light" element exists in Va. Code § 8.01-40, *see* Dkt. 248, at 47, his legal position asks the Court to eviscerate 48 C.F.R. § 52.203-13, which compels government contractors, many of which are based in Virginia, to "timely disclose" credible evidence of principals, employees, agents, or subcontractors engaging in

---

[23] Anderson's complaint initially referenced use of his name "in a false light," Dkt. 29, at 28, ¶ 94, but he later disavowed this putative element as "extraneous." *See* Dkt. 248, at 47.

certain misconduct. *See id.* § 52.203-13(b)(3).[24] He creates an actual conflict between federal regulations and state law, which would undoubtedly be subject to federal preemption. *Hillsborough Cty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985) ("[S]tate law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises when compliance with both federal and state regulations is a physical impossibility. . . .") (citations and quotation marks omitted) (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143 (1963)).

Last, Anderson's interpretation of Va. Code 8.01-40 contains a limiting principle that would extend liability far beyond that which the statute's purpose reasonably accommodates. Under his proposed reading of Va. Code § 8.01-40, *any* use of a Plaintiff's name in *any* commercial context would give rise to liability if harm results. For example, a contractor would be prohibited from disclosing an employee's publicly available criminal history at the request of a prospective client, as such a disclosure would harm the employee's "personal and professional reputation." *See* Dkt. 29, at 28, ¶ 95. In effect, Plaintiff's interpretation would penalize routinized communications that promote safe and reliable business transactions in Virginia.

\* \* \*

Fluor is entitled to summary judgment on all Counts set forth in Anderson's operative complaint.

## V.   CONCLUSION

For the reasons stated above, and for good cause shown, Anderson's motion (Dkt. 224) is **GRANTED IN PART** and **DENIED IN PART**. The Court **GRANTS** summary judgment on

---

[24] Anderson implies that contractors leverage § 52.203-13 disclosures to "competitively position" for awards as a matter of course. *See* Dkt. 29, at 28, ¶ 94. His proposed position would therefore render Virginia law supreme to federal law when 48 C.F.R. § 52.203-13 applies. This position violates first principles of federal constitutional law.

Counts III, IV, V, VII, VIII, and IX, **GRANTS** partial summary judgment on Counts I and II, and **DENIES** summary judgment on Counts VI. Fluor's motion (Dkt. 226) is **GRANTED.**

It is **SO ORDERED**.

January 4, 2021
Alexandria, Virginia

Liam O'Grady
United States District Judge